SALMON CORPORATION, a corporation, Appellant,

v.

FOREST OIL CORPORATION, a corporation, and Wiser Oil Company, a corporation, Appellees.

No. 43855.

Supreme Court of Oklahoma.

April 16, 1974.

Rehearing Denied July 1, 1975.

---

R. H. Wills, Sr., R. H. Wills, Jr., Tulsa, for appellant.

Covington, Gibbon & Poe by A. M. Covington, Tulsa, for appellees.

BARNES, Justice:

The parties to this appeal are oil producing companies. They will be referred to as "Forest", "Wiser", and "Salmon", respectively.

Beginning in 1939, and continuing into the latter part of 1957, Forest operated several oil and gas leases it and Wiser owned on land in Sections 15, 21, 22 and 28, Township 27 North, Range 12 East, Osage County, all of which land belonged to the Osage Tribe of Indians. On these leases a total of 71 wells had been drilled to the Wayside Sand, encountered at varying depths of 750 to 800 feet below the surface; and many of the wells produced oil from said sand. Toward the end of this 18-year period, when this production became greatly depleted, Forest, after concluding that the leases held little promise for additional profitable production by inaugurating some secondary recovery method, applied to, and received permission from, the Osage Indian Agency to plug the wells and abandon the leases. Further reference to these wells will be by individual number, such as "Well No. 17", for instance.

Thereafter, in 1961, Salmon acquired oil and gas leases on the same, and nearby, sections of land, for the purpose of attempting further production from the Wayside Sand by a system of waterflooding said Sand, called the "5-spot" method. This entailed the drilling of a hole or well called a "water injection well" in each of the four corners of square 10-acre surface areas, and then injecting water into the sand through these wells to force oil remaining in the sand to come to the surface through a fifth well called the "producing well", drilled in the center of the 10-acre square.

By June, 1962, Salmon had installed said waterflooding system and had begun operating it. This operation caused pressure in the Wayside Sand reservoir to increase, and, in November of that year, salt water was seen emerging to the surface in what had been Forest's old Well No. 13. Salmon, with the permission of the Osage Indian Agency, then went into this old well and replugged it, as it did Well No. 17 early in 1964 when salt water appeared in a creek near it. In time, all 71 of the old wells Forest had previously operated were reentered and plugged, or replugged, by Salmon.

Two actions were thereafter instituted by Salmon against Forest and Wiser to recover damages in recoupment of its costs and losses in plugging these wells. As in the trial of these cases, Forest assumed sole responsibility, as operator of the leases, for the acts of which complaint was made against both of said defendants, we will hereafter omit Wiser from our discussion. In its petitions in the two cases, later consolidated, Salmon alleged that Forest failed to plug certain of the 71 old wells in a manner sufficient to seal off the Wayside Sand and to prevent the escape therefrom of oil, gas, or other substances, including the salt water injected into it by Salmon for its above described waterflooding project. This was alleged to violate applicable laws and rules and regulations, both of the United States and of the State of Oklahoma, and to constitute gross negligence and to create a nuisance, which continued until abated by Salmon's reentering and replugging the 71 wells, as aforesaid. Although it alleged that none of the wells was plugged in the manner Forest reported to the Osage Indian Agency, Salmon alleged that it could not be definitely established that the way 46 of the old wells were plugged injuriously affected the waterflooding operation. Salmon did allege, however, that because 25 of the 71 wells had been discovered to have been so negligently or improperly plugged as to affect the waterflooding operation, plaintiff had to reenter and replug the other 46 wells to make sure that they had not been so poorly plugged that they would also detrimentally affect the waterflooding operation or cause pollution.

The recovery Salmon sought for its expenses in reentering and replugging the above mentioned 25 wells was the total sum of $26,841.65. For its expenses on the other 46 wells, Salmon sought a total recovery of $43,609.86.

In addition to a general denial, Forest's answer to Salmon's petitions included averments, in effect, denying that, at the time it plugged the wells in 1957, Forest had any duty to plug them in such a way as to withstand a buildup of the Wayside Sand's reservoir pressure from future waterflooding projects such as Salmon inaugurated years later [as aforesaid].

At the trial, Forest took the position that in 1957 the plugging of oil and gas wells required by Oklahoma statutes did not have for its purpose the facilitation of any future waterflooding operation; and testimony was elicited from at least one of the men who handled Forest's plugging operations that this work was never undertaken or performed for that purpose. Forest did concede, however, that it was its duty to comply with the United States Secretary of the Interior's well-plugging regulations and requirements, administered by officials of the Osage Indian Agency.

The jury was relieved of consideration of the aforementioned 46 wells Salmon had replugged as a precautionary measure, when the trial court sustained, as to them, the demurrer which Forest interposed at the close of Salmon's evidence.

Thereafter, in his fourth instruction to the jury, the trial judge defined the "plugging" of a well drilled for oil as "closing" its wellbore "in such a way or manner as to prevent the migration of oil, gas, salt water, or other substance, from one stratum into another." In his fifth instruction, the judge told the jury that the prevention of oil and gas from escaping the stratum in which they were found is one of the purposes of regulations requiring well plugging. By his Instruction No. 7, the court told the jury that:

> "An improperly or insufficiently plugged and abandoned oil well is a nuisance and anyone affected thereby has a right to do whatever is necessary to abate the nuisance and is entitled to recover all of his reasonable expenditures in so doing from the party who improperly and insufficiently plugged and abandoned the well."

In his Instruction No. 10, the court stated that the aforementioned Rules and Reg-

ulations of the United States Secretary of the Interior [administered through the Osage Indian Agency] pertaining to the plugging of the wells involved had the force and effect of law; and, in his Instruction No. 11, the judge stated that Forest was required to comply with them, as well as with any written or oral instructions given it, or its plugger, by the Osage Indian Agency. The Rules and Regulations referred to were set forth in the trial court's Instruction No. 9 as follows:

"A. Lessee shall plug and fill all dry or abandoned wells on the leased lands in the manner required, and where any such well penetrates an oil or gas bearing formation it shall be thoroughly cleaned to the bottom of the hole before being plugged or filled, and shall then be filled with mud-laden fluid of a consistency approved by the Inspector, from the bottom to the top thereof, before any casing is removed from the well, or in lieu of the use of such mud-fluid, each oil and gas bearing formation shall be adequately protected by cement or approved plugs or by both such plugs and cement, and the well filled in above and below such cement or plugs with material approved by the Inspector.

"B. Where both fresh water and salt water are encountered in any dry or abandoned well which is not being filled with mud-laden fluid as hereinbefore provided, the fresh water shall be efficiently protected against contamination by cement or approved plugs, or by both such cement and plugs, to be placed at such points in the well as the Inspector shall approve for the protection of the fresh water."

By his Instruction No. 12, however, the court defined Forest's duty in respect to complying with the above Rules and Regulations as only "substantial" compliance; and in his Instruction No. 16 told the jury that if they found Forest "substantially complied" with those Rules and Regulations, then their verdict should be for Forest.

After the jury returned a verdict for the defendant Forest, and judgment was entered accordingly, the plaintiff Salmon lodged the present appeal, in which it charges, among other things, that the trial court's giving of the above described Instruction No. 16 was error. We agree. There was no evidence, or authority shown, that *substantial compliance* with the Secretary of the Interior's Rules and Regulations for the plugging of wells on Osage Indian Agency lands was all that was required of oil and gas lessees of such lands.

The undisputed evidence was that, in preparing the wells in question for their initial production from the Wayside Sand, a hole called a "shot hole" was made in this Sand by exploding a "shot" of nitroglycerin there. Mr. Frank, who, as an engineer in the Osage Indian Agency's Branch of Minerals from early in 1955 to the middle of the year 1959, had the duty of inspecting such oil lease operations for the prevention of waste and pollution and reporting on them to H. T. Ferrier, Chief of said Branch, testified [by deposition] that said Indian Agency not only issued written instructions to lessees [such as Forest] concerning such plugging operations, but also gave them oral instructions. He further testified that under such instructions the shot holes were ordinarily filled with crushed rocks, and two cement plugs were usually placed in each well, one of them on top of the shot hole [over the crushed rocks] and the other below the fresh water and "above any sand that would produce salt water, to prevent commingling or pollution."

The above mentioned Mr. Ferrier testified inter alia, in substance, that waterflooding was very common in Osage County in 1957 [when the subject wells were plugged] and that the Osage Indian Agency's policy [in its oil well plugging requirements] was to prevent fresh water formations' contamination by leakage from salt water formations. But he also testified:

"Our interest in any pool that is producing at the time, or has produced oil, as far as plugging is concerned is that the plugging would be such that in the event some future discovery of the method of recovering oil, or as it is known already, the repressuring with water if it ever be attempted on the pool we would want it plugged to protect the formations, and make it possible to conduct such recovery methods; in other words, we would want it to protect the oil formation." [which, in answer to his interrogator's next question, he said was the Wayside Sand, in the present instance.]

Mr. Feltenberger, Forest's Field Superintendent, testified that Forest had engaged in waterflooding in Osage County since 1935.

In view of the evidence that Forest had not met the Osage Indian Agency's requirements in the plugging of some of the wells [although its pluggers' reports on that work had been approved by said Agency] and that Salmon's later discoveries that some of the plugs' failure to contain the increased reservoir pressure resulting from Salmon's waterflooding may have been due to the failure of the cement in such plugs to set on the top of the aforementioned shot holes [which Forest's pluggers admitted they took no measures to assure], a pivotal question of fact for the jury to determine was: If Forest, as admittedly was its duty, had in fact plugged the wells in conformity with the directions of the Secretary of the Interior or the Osage Indian Agency, would this have been sufficient to contain the increased reservoir pressure generated by Salmon's waterflooding operations? The trial court's Instructions Nos. 12 and 16, which necessitated only a finding of "substantial compliance" with those requirements, gave the jury no positive or definite criterion with which to determine this question.

For the same reason that Instruction No. 16 was error, Instruction No. 14 was also error. Instruction No. 14 reads:

"You are instructed that the defendants owed the duty of exercising reasonable care in its efforts to comply with the requirements of plugging said wells." This instruction is basically wrong. Forest owed a duty to Salmon [or to anyone else for whose protection the Agency's Rules were promulgated] to comply with the requirements of plugging prescribed by the Osage Indian Agency. This instruction magnified the vice in Instruction No. 16. Moreover, there is nothing in the trial court's instructions, as a whole, or individually, that renders these errors harmless.

■ It is also urged by Salmon that Forest was required to comply with Rules and Regulations of the Oklahoma Corporation Commission applying to plugging, as well as to the Rules and Regulations of the Osage Indian Agency. It is Salmon's position that both the Agency and the Commission required that the wells in a reservoir depleted for primary production be plugged in such a manner that, if waterflooding of the reservoir ensued, the plugging would be adequate to prevent migration. We find no reversible error in the trial court's failure to so instruct the jury because Salmon points to no Commission rule or regulation imposing a greater duty on those in Forest's situation then imposed by the Osage Agency's requirements.

In accord with the foregoing, it is our opinion that the trial court committed reversible error in its instructions to the jury, and for that reason the jury's verdict for defendant, exonerating Forest from liability for the cost of Salmon's reentering and replugging the 25 wells proved to have been insufficiently plugged to withstand the increased pressure created by Salmon's waterflooding, must be vacated and the judgment in accord therewith reversed and that case remanded to the trial court for a new trial.

■ As to the other 46 wells which Salmon reentered and replugged without it ever having been established that Forest had plugged insufficiently to withstand the

pressure of Salmon's waterflooding, we have heretofore noted the discovery Salmon made when it entered and replugged Well No. 17 and several other wells Forest purported to have plugged. Salmon found the content of the Wayside Sand was not being contained by the plug Forest had allegedly placed in each well on the crushed rock immediately above the Wayside Sand. This discovery placed Salmon under the risk of heavy liability for pollution and waste by our holding in Gulf Oil Corp. v. Hughes, Okl., 371 P.2d 81. In fact, this heavy liability was emphasized by Forest in its brief at page 17. If Forest was the cause of placing one in Salmon's position under such heavy liability for waste and pollution, we cannot deny Salmon's right to reduce such liability to the minimum by abating such a nuisance that had become known to it. However, whether a reasonable and prudent waterflooder in Salmon's position would have believed that the 46 wells had not been sufficiently plugged to withstand the increased pressure of the waterflooding and would have considered it prudent to reenter and replug them on the basis of the information Salmon had, before it had ever been definitely established that those wells had not been plugged in a manner to withstand that pressure, would be a question for the trier of the facts. It is our opinion that, on the basis of the record in this case, the trial court erred in sustaining Forest's demurrer to the evidence as to those 46 wells.

From the above, it will be seen that the new trial we are ordering should present the following questions for determination:

(1) Did Forest comply with the Osage Indian Agency's requirements as to plugging of the wells?

If the trier of the facts finds that it did, then verdict and/or judgment should be for said defendant. If the answer to this question is negative, then the next issue to be determined is:

(2) If Forest had complied with the Osage Indian Agency's requirements as to the plugging of the wells, would this have sealed off the Wayside Sand in all of the wells in such a way as to have withstood the increased pressure of Salmon's waterflooding?

If the trier of the facts answers this question in the negative, then the defendant is entitled to judgment as to all 71 of the wells. But if the answer to this question is affirmative, and it is also determined that Forest did not comply with the Agency's requirements, then judgment should be entered for the plaintiff in the amount of the reasonable cost of reentering and replugging the 25 wells proved to be leaking under that increased pressure.

(3) As to the other 46 wells, if the fact finder determines that a reasonable and prudent waterflooder would have believed, on the basis of the information Salmon had that those wells also probably would leak under the increased pressure of Salmon's waterflooding [in view of the fact that one or more of the other wells were leaking under that pressure] and would have considered it prudent to reenter and replug them before such leaking actually occurred and before further proceeding with the waterflood project, then additional judgment should be entered for plaintiff in the amount of the reasonable cost of reentering and replugging those 46 wells. However, if it is determined that a reasonable and prudent waterflooder would not have done this work in the situation above described, then Forest, in a judgment for defendant, should be exonerated from reimbursing Salmon for the amount it is claiming for such reimbursement.

In accord with the foregoing, the trial court's orders overruling plaintiff's motions for a new trial in these cases are hereby reversed and they are remanded to

said court with directions to grant plaintiff a new trial and proceed in a manner consistent with the views expressed herein.

WILLIAMS, V. C. J., and IRWIN, LAVENDER, SIMMS and DOOLIN, JJ., concur.

DAVISON, C. J., concurs in result.

BERRY and HODGES, JJ., dissent.