573 F.2d 1158
 Fayetta Gilbough GANNON, Individually, and as Executrix and
Trustee of the Estate of Clair H. Gannon,
Deceased, Plaintiff-Appellant,
v.
MOBIL OIL COMPANY, a Division of Socony Oil Company, Inc., a
corporation, Defendant-Appellee.
 No. 76-1945.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Jan. 26, 1978.
Decided March 30, 1978.
Rehearing Denied May 8, 1978.
 
 Andrew Wilcoxen, Muskogee, Okl. (Fred G. Gannon, Dallas, Tex., on the brief), for plaintiff-appellant.
 Max H. Lawrence, of Walker, Lawrence & Walker, Oklahoma City, Okl., and Sid M. Groom, Jr., Edmond, Okl. (David R. Latchford, Mobil Oil Corp., Denver, Colo., on the brief), for defendant-appellee.
 Before SETH, Chief Judge, and BARRETT and McKAY, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Appellant, plaintiff below, Fayetta Gilbough Gannon, individually and as Executrix and Trustee of the Estate of Clair H. Gannon, Deceased (Gannon), appeals from a Directed Verdict awarded appellee, defendant below, Mobil Oil Company, a Division of Socony Oil Company, Inc., a corporation (Mobil). Jurisdiction is based on diversity.
 
 
 2
 Gannon sued Mobil for both compensatory and exemplary damages predicated upon Mobil's alleged torts of trespass and intentional interference with Gannon's contractual rights under an oil and gas lease granted January 7, 1972, arising by reason of the plugging of certain abandoned oil wells on the Gannon property by Mobil. The trial court entered a detailed memorandum of findings and conclusions concurrent with the judgment granting the directed verdict.
 
 
 3
 On October 14, 1959, Gannon executed an oil and gas lease to Mobil covering 570 acres situate in Murray County, Oklahoma, for a primary term of ten years or so long as oil, gas or other hydrocarbons were produced therefrom. There were six nonproducing oil wells located on the lands at that time, completed in the Second Bromide Sand. Mobil or its assignee-agent re-entered five of the six wells and, in addition, drilled and completed one more well to the Bromide Sand. Mobil also undertook an extensive "fireflood" operation in an effort to obtain commercial production of the low gravity oil in the reservoir, but terminated the uneconomic operation in October, 1966. On August 3, 1967, Mobil "farmed out" the wells by partial assignment of its leasehold rights for a term of three (3) years to Nelson I. Geyer (Geyer), d/b/a Thermo-Dyne, Inc. Geyer undertook an injection of oil condensate commencing in April of 1968 in an effort to revive production from the lease at a total cost of about $200,000.00. His efforts, just as those of Mobil, were unsuccessful in terms of realizing commercial production. Geyer produced a total of 9,982.35 barrels of oil and condensate, most of which, however, had been injected in the wells. Geyer's right under the partial assignment expired December 24, 1970, at which time he terminated all efforts to obtain commercial or "economic" production. Thus, the basic lease also terminated, at the latest possible date, on December 24, 1970.
 
 
 4
 Mobil determined to abandon the Gannon lease and to plug the wells. Thereafter, it commenced plugging and abandonment operations in July, 1971. Geyer by letter of August, 1971, offered to relieve Mobil of any obligations relating to the plugging of the wells. Geyer informed Mobil of his desire to assume the responsibility of plugging the wells and purchasing Mobil's equipment at a "nominal" fee and then pursuing attempts to obtain a new oil and gas lease from Gannon. Mobil, however, declined the Geyer offer both because Mobil had been advised that it could not make any assurances as to whether its lease from Gannon was then valid and because ". . . it would be difficult for Thermo-Dyne (Geyer) to indemnify Mobil against all liability as the result of sale of equipment and assumption of plugging and abandoning the wells." (Pl. Exh. # 11, R., Vol. III, p. 513.) Mobil continued with the plugging process and notified Geyer to remove the equipment from the wells which belonged to him.
 
 
 5
 On November 1, 1971, Gannon wrote to Mobil inquiring about Mobil's intentions relative to the property. Mobil informed Gannon that it was then in the process of plugging (and abandoning) the wells. Gannon's attorney then spoke by telephone with a Mobil representative, advising that Gannon was then negotiating with Geyer for a new oil and gas lease on the property and that Gannon was the owner of the wells rather than Mobil. He demanded that Mobil not plug the wells. (R., Vol. I, pp. 36-38.)
 
 
 6
 Mobil's landman, one C. H. Bland, did receive a telephone call from Gannon's attorney relative to the plugging operation. Bland did not recollect the specifics of the conversation except that it did deal with the plugging operation. Bland testified that he informed Gannon's attorney that he was not familiar with well plugging matters. Gannon's attorney, however, testified that Bland (whom he seems to equate as Mobil) stated that the wells would not be plugged. In any event, the record reflects that even though Mobil proceeded with the plugging operations by pouring hundreds of sacks of cement into the oil producing formation, cementing steel tubing and iron into each well and filling each well from top to bottom with cement that neither Gannon, her attorney or any person on her behalf undertook action, steps or threats to prevent Mobil from proceeding with the plugging operations until the instant lawsuit was filed on October 11, 1973.
 
 
 7
 Mobil filed its Notice of Intention to Plug the subject wells with the Oklahoma Corporation Commission prior to commencement of the plugging operations in July, 1971. The record reflects that Geyer's efforts under the three year partial assignment of December 29, 1967, realized only limited production from the wells for April, 1968, through February, 1969. Some production was last sold from the lease by Geyer in September, 1971. Mobil had, of course, assigned only the right to production from the Second Bromide Sand to Geyer for the three (3) year term, reserving all other leasehold rights, together with all of the attendant duties, obligations and responsibilities imposed by virtue of such ownership.
 
 
 8
 Mobil completed the plugging operations on December 8, 1971. Geyer, who had obtained a new oil and gas lease from Gannon on the property for a three-year term commencing January 7, 1972, attempted to re-enter one of the wells plugged by Mobil but was unable to drill out the steel and iron which had been cemented into the hole. Geyer also completed a new well in the Second Bromide Sand in August, 1974, and thereafter re-entered one of the wells plugged by Mobil, but gave up that effort. Geyer testified that in his opinion it would cost between $40,000.00 and $50,000.00 to re-enter the plugged wells because of the tail pipe and iron in the holes but that a prudent operator would prefer to spend $100,000.00 per well in drilling new wells rather than attempting to overcome the hazards of re-entry of the abandoned wells. (R., Vol. I, pp. 137, 141-144.)
 
 
 9
 Gannon acknowledges that it was not economically feasible for Mobil to produce the low gravity oil in 1966. However she contends that when Mobil commenced the plugging operation in 1971 the oil from the wells could have been produced in paying quantities because of the rapid increase in the price of crude oil. The trial court excluded evidence of the economics prevailing at the time of trial in June of 1976.
 
 
 10
 On appeal, Gannon contends that the trial court erred in granting the directed verdict by finding that: (1), (2) and (3), Gannon could not amend her complaint and the pre-trial order; Gannon had to plead and prove affirmative defenses to justify torts; Mobil's lease did not terminate until December 8, 1971, (4) Mobil was the "owner" and "operator" of the subject wells at the time it plugged same as such terms are defined by the rules and regulations of the Oklahoma Corporation Commission, (5) the wells were not prospect holes and the law applicable to the destruction of same did not apply, (6) the wells could not be produced in paying quantities at the time of the plugging operations, and thus erred in excluding evidence of the economics of producing the wells subsequent thereto and up to the time of trial, (7) the assignment of the wells and lease insofar as it covered the oil sand in which the wells were completed did not relieve Mobil of whatever duty, if any, it may ever have had to plug the wells, (8) Mobil had a duty to plug the wells in view of the facts prevailing at the time of plugging and Rule 3-401(c), (9) certain facts controlled, (10) certain conclusions of law applied, (11) evidence pertinent to exemplary damages be excluded, and (12) Gannon's motion for directed verdict should be denied.
 
 
 11
 Guyer's testimony was most pertinent to the trial court's decision. He stated that in October or November of 1971 the type of sour crude being produced from the Gannon lease would sell for about $2.50 per barrel, after blending; that in order to render it marketable it would have cost much more than the sale price; and that his company lost about $400,000.00 in the process of the two operations conducted on the Gannon property. Even so, Geyer said that he was " . . . ready to lose a couple of hundred (thousand) more." (R., Vol. I Supp., pp. 134-136.) As to the question of the validity of Mobil's lease after Geyer's unsuccessful efforts, Geyer acknowledged that on August 23, 1971, his efforts had been unsuccessful in producing from the Gannon lease "to the point of economics." He further stated that while he would like to continue "with a research program" on the property, his attorneys advised that there was a question about the validity of the Mobil lease in that although Geyer had produced a "limited amount" of oil during 1970 and 1971, still this was "perhaps not enough to hold the lease by production." (R., Pl. Ex. # 10, Vol. III, p. 512.)
 
 
 12
 Following trial and oral arguments, the trial court considered the respective motions for directed verdict. The court found that as a result of the partial assignment from Mobil to Geyer and the attendant contractual arrangement between them, that the work " . . . performed by the farm-out agreement of Geyer was in truth and in fact the work and services trying to produce oil for . . . Mobil . . . they were associates and partners to the degree set out in their agreement." (R., Vol. I, pp. 315, 316.) Thus, the court recognized Mobil's continuing obligation to plug abandoned wells on the Gannon leasehold property. Reaching over to the "significant" period of September 3, 1971, the court observed that while Geyer had contacted Mobil regarding his desire to continue operations on the Gannon lease, Mobil rejected this request both because Mobil could make no assurances that its lease was still valid and because Mobil did not believe that Thermo-Dyne (Geyer) was financially capable of indemnifying Mobil against all liability with respect to the obligation of plugging and abandoning the wells and purchasing Mobil's equipment. (R., Vol. I, p. 317.) When it became clear, as the trial court found it to be as a matter of law, that Mobil was obligated to plug and abandon the wells (and when Mobil had in fact commenced those operations) Gannon did nothing to stop those operations in order " . . . to save himself from damages he now claims (to have) suffered." (R., Vol. I, pp. 317-319.)
 
 
 13
 In regard to Mobil's lease termination, the trial court pointedly referred to a letter directed to Mobil by Gannon's attorney after Gannon was informed of Mobil's intention to plug and abandon the subject wells wherein it was stated that, "It is our understanding that this property has been dormant. However, during the months of August, 1971, and September, 1971, small royalties were paid and apparently sold from the lease." (R., Vol. I, pp. 318, 319.) The trial court concluded therefrom that the receipt and retention of the royalty payments aforesaid were recognition by Gannon that such proceeds were then paid from operation of the lease and thus that the lease was then viable in the name of Mobil. (R., Vol. I, pp. 318, 319.)
 
 
 14
 In its formal findings of fact and conclusions of law, the trial court reviewed the factual background together with the statutory and regulatory laws of Oklahoma relating to the right and duty to plug abandoned oil wells. The court specially found that Mobil was the owner and operator of the wells on the lease at the end of the Geyer farm-out and that Mobil had the duty, liability and responsibility to plug the wells and that the partial assignment to Geyer did not relieve Mobil of this responsibility. (R., Vol. II, pp. 480, 481.) The court concluded, having considered the evidence in the light most favorable to Gannon, that " . . . the evidence supported but one conclusion with which reasonable men could not disagree." (R., Vol. II, pp. 484, 485.) We agree.
 
 I.
 
 15
 The critical, dispositive issue, found as controlling by the trial court, is: that Mobil was, at all times involved, the owner and operator of the wells on the Gannon lease and that at the end of the Geyer farm-out operations Mobil had the duty, liability and responsibility to plug the wells which had then been abandoned. We agree with the trial court's analysis of the facts and the applicable law.
 
 
 16
 Oklahoma law provides that upon abandonment of an oil well the owner or operator is obligated, responsible and liable for plugging the well in accordance with the applicable rules of the Corporation Commission. 17 Okla.Stat.Ann.1971, § 53; 52 Okla.Stat.Ann.1971, §§ 273, 309 and 310; OCC-OGR § 3-401(a); Loriaux v. Corporation Commission, 514 P.2d 941 (Okl.1973); United States v. 79.95 Acres of Land, etc., Rogers Co., Okl., 459 F.2d 185 (10th Cir. 1972); Bryan v. State, 133 Okl. 213, 271 P. 1020 (1928).
 
 
 17
 The Oklahoma Corporation Commission was created by Art. IX of the Oklahoma Constitution in 1907. Under present day statutes, the Commission has broad power to prescribe rules and regulations governing the plugging of all abandoned oil and gas wells. Such rules and regulations provide, inter-alia, that: Each well in which production casing has been run, but which has not been operated for six months and each well in which no production casing has been run, but for which drilling operations have ceased for thirty consecutive days shall be immediately plugged, OCC-OGR § 3-401(b); each well must be plugged in a manner recognized as good and accepted practices and standards in the industry, OCC-OGR § 3-404(b); any person who drills or operates any well for exploration, development, or production of oil or gas is required to furnish, on forms approved by the Commission, an agreement in writing to drill, operate, and plug wells in compliance with the rules and regulations and to submit a semiannual financial statement showing that his net worth (in Oklahoma) is not less than $10,000.00; the owner and operator of any oil or gas well, whether cased or uncased, is jointly and severally liable and responsible for the plugging thereof in accordance with the rules and regulations as to abandonment and plugging prescribed by the Oil and Gas Conservation Division, OCC-OGR § 3-401(a). The authority of the Oklahoma Corporation Commission, under the governing statutes, has been consistently recognized in the rule making area to be that of promulgating rules requiring adequate and proper plugging and abandonment of an oil and gas well under the state's police power in order to prevent waste and pollution and to provide for the safety of the public generally. Wakefield v. State, 306 P.2d 305 (Okl.1957); Sheridan Oil Company v. Wall, 187 Okl. 398, 103 P.2d 507 (1940); Magnolia Petroleum v. Witcher, 141 Okl. 175, 284 P. 297 (1930). Thus, the duty and liability to plug arises when an oil and gas well is abandoned or taken out of production. The essence of the concept of abandonment is aimed principally at preventing fugacious materials in the various strata pierced by the well from entering the bore so as to permit its movement into other strata or onto the surface. Significantly, Oklahoma has recognized a common-law duty to plug. Sheridan Oil Company v. Wall, supra.
 
 
 18
 We view it as significant that OCC-OGR § 3-407 is the only regulation relating directly to the landowner's utilization of an abandoned oil or gas well. It provides that if such a well may safely be used to provide fresh water and such utilization is desired by the landowners, the cement plug, extending 50 feet into the surface casing, shall be set, except that the top thirty foot plug need not be set, provided that written authority for such use is secured from the landowner and filed with the Commission's plugging record. This relieves the operator only of the responsibility above the thirty foot plug. OCC-OGR § 3-407.
 
 
 19
 Sheridan Oil Co. v. Wall, supra, holds that a lessee who abandons an oil well without proper plugging stands in the position of a tenant who surrenders the premises without making the necessary repairs. The court there awarded the landowner recovery against the lessee for the costs of re-plugging the abandoned oil well in order to prevent pollution.
 
 
 20
 Loriaux v. Corporation Commission, supra, holds that the owner and operator of oil and gas leases upon which wells had been drilled is obligated to plug abandoned wells, despite an assignment of the leases, where the wells were found to have been abandoned prior thereto. And, in an action to recover damages resulting from an alleged improperly plugged well, it has been held that the causal connection can be established from circumstantial evidence and that the question of negligence and proximate cause of the injury or damage is one for jury determination. Sunray Mid-Continent Oil Co. v. Tisdale, 366 P.2d 614 (Okl.1961). See also: Salmon Corporation v. Forest Oil Corporation, 536 P.2d 909 (Okl.1974).
 
 
 21
 Thus, just as the trial court found, the Oklahoma authorities above cited, when considered in the light of the facts reflected in the record before us, fully support these conclusions: that all operators are responsible for proper plugging of abandoned oil and gas wells for the protection of the surface and sub-surface strata; that cessation of production with no intent to continue operations evidences abandonment; that Mobil was the owner and operator of the wells on the Gannon lease when Geyer's rights expired under his partial assignment contract and that Mobil was, as such owner and operator, obligated by law to plug the wells.
 
 
 22
 A decision of particular relevance, we believe, is that of Amax Petroleum Corporation v. Corporation Commission, 552 P.2d 387 (Okl.1976), involving an action brought against Amax to require it to plug certain gas wells. By various assignments, Amax became the owner of an oil and gas lease upon which several gas wells had been previously drilled, developed and operated. In 1957 or 1958, Amax determined to abandon these wells and the field of which they were a part. No production had been realized from the wells after 1957. On July 28, 1959, about two years after the gas wells were shut in, Amax assigned the oil and gas lease upon which the wells were drilled back to the landowners, an elderly couple, neither of whom had been engaged in the oil and gas industry (or had at any time operated oil or gas wells). The landowners died within one year following re-assignment. Their daughter became the owner of the property. The Commission ordered that Amax plug the wells. Amax refused, contending that the Commission order was invalid because, (a) the Commission had no authority to require the plugging of any oil or gas well which has not been abandoned or permanently abandoned and (b) that there was no evidence that the wells had been abandoned or permanently abandoned prior to the date Amax assigned the lease back to the original landowners-lessors. The Court held that the re-assignment from Amax to the landowners did not have the legal effect contended by Amax. In 1973 the Commission's field inspector found some of the wells had not been properly plugged since their abandonment in 1959. In pertinent part, the Court held that the re-assignment of the lease from Amax to the original landowners did not relieve Amax of its duty to plug the wells:
 
 
 23
 While the statute could be more specific, the things about which it could be more specific are certainly implicit in the statute. Thus, the person to plug the well is the lease operator, not a stranger to the operation; and the time to plug is when the well is abandoned and certainly not before. We would assume that a definition of abandonment would add little to resolving specific fact situations where, as here, a question is raised as to whether abandonment has occurred or not.
 
 
 24
 552 P.2d at 391, 392.
 
 
 25
 In the case at bar there can be no dispute that Mobil clearly announced its intention to relinquish the wells and the lease premises. Thus, Mobil's intention was affirmatively declared. Such acts constitute a relinquishment of the premises. See: Dow v. Worley, 126 Okl. 175, 256 P. 56 (1926); Carter Oil Co. v. Mitchell, 100 F.2d 945 (10th Cir. 1939); 1 Am.Jur.2d §§ 1, 39 and 40. Under Oklahoma decisions, the "abandonment" of an oil and gas lease comes about with a concurrence of an intention to abandon and the act of physical relinquishment. Magnolia Petroleum Co. v. St. Louis-San Francisco Ry. Co., 194 Okl. 435, 152 P.2d 367 (1944).
 
 
 26
 While cessation of operations under an oil and gas lease is not alone sufficient to establish abandonment (Fisher v. Dixon, 188 Okl. 7, 105 P.2d 776 (1940)), it has been held that an unreasonable delay by the lessee in undertaking further exploration coupled with the lessee's declaration that further drilling would be unprofitable is sufficient evidence to establish abandonment. Fox Petroleum Co. v. Booker, 123 Okl. 276, 253 P. 33 (1926). See also; Doss Oil Royalty Company v. Texas Co., 192 Okl. 359, 137 P.2d 934 (1943); Dow v. Worley, supra. Both elements were clearly established on the part of Mobil in the instant case.
 
 II.
 
 27
 We have carefully considered the additional allegations of trial court error urged by Gannon. We hold that they are individually and collectively without merit. For the most part they have been effectively disposed of adversely to Gannon in our discussion of the facts, contentions and legal principles.
 
 
 28
 At the time that Mobil determined to abandon the wells there was no evidence that further operations would prove economically feasible. It matters not that a change in the market value of the crude oil at some future time (here, as alleged, at the time of trial) may have then dictated additional operations rather than abandonment. Gannon's own expert, Geyer, acknowledged that the wells and the operations had proven uneconomic at the time Mobil declared its intention to plug the wells and abandon the property. Furthermore, Geyer testified that the method and technique employed by Mobil in plugging was well done. There were others, of course, who testified otherwise. No reference is made that the Oklahoma Corporation Commission has at any time or in anywise challenged Mobil's method of plugging the wells on the Gannon property. We are puzzled by Gannon's allegation that Mobil was a "trespasser" when it entered upon the premises to plug the wells because the lease had terminated. Gannon contends that Mobil had no right to enter upon the premises after the oil and gas lease terminated and then to "destroy . . . wells to which it had no right." (Brief of Appellant, p. 50.) Even though the trial court found with substantial support in the record that Mobil's lease had not terminated when it commenced plugging operations, we believe that if Gannon's contention were to prevail it could very likely render Oklahoma's statutory and regulatory mandates requiring plugging of abandoned wells in order to protect the public interest ambiguous to the extent that an operator such as Mobil might contend, following simple termination of the lease, that it has been relieved of the statutory, regulatory and common law obligation and responsibility to plug the wells. Such a result is not countenanced under Oklahoma law. It would not serve the public interest.
 
 
 29
 WE AFFIRM.