**JARVIS DRILLING, INC., et al., Appellants–Plaintiffs,**

v.

**MIDWEST OIL PRODUCING CO., et al., Appellees–Defendants.**

No. 82A04–9302–CV–49.

Court of Appeals of Indiana, Fourth District.

Dec. 29, 1993.

---

K. Richard Hawley, Hawley, Hudson & Almon, Mt. Vernon, for appellants-plaintiffs.

Patrick A. Shoulders, Steven K. Hahn, Ziemer, Stayman, Weitzel & Shoulders, Evansville, for appellee Crystal Oil Co.

Terry Noffsinger, Noffsinger, Price, Bradley & Shively, Evansville, and Peter J. Rusthoven, Barnes & Thornburg, Indianapolis, for appellees Midwest Oil Production Co., et al.

CONOVER, Judge.

Plaintiffs–Appellants Jarvis Drilling, Inc., James D. Kitchin, III, Ann Walton, and George Busler (Jarvis Drilling) appeal the Vanderburgh Superior Court's entry of summary judgment in favor of Defendants–Appellees Midwest Oil Producing Co., Pedro Enterprises, Inc., Perdue Enterprises, Inc., David A. Perdue, Doran E. Perdue, Jr., Ellmar Oil Co., Dale E. Perdue, Raylene L. Bordfeld, as Trustee of the J & M Trust, John T. Walsh and Mary G. Walsh, Debra Ruth Zisla, Mary Beth Perdue, Hugh E. Ralph, (Midwest Oil) and Crystal Oil Company (Crystal Oil) on the motions for summary judgment they filed in Jarvis Drilling's action seeking monetary damages for costs incurred in plugging a non-producing well.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

This appeal presents the following restated issues:

1. whether material issues of fact remain which require a trial on the merits;

2. whether some fractional share owners were represented by Midwest Oil as their agent; and

3. whether Crystal Oil, a former operator of the well, is liable for plugging costs.

Crystal Oil originally owned and operated several oil wells in Kentucky and Indiana, including the Egli # 1 well in Posey County, Indiana. When it quit producing, Crystal Oil abandoned that well without obtaining a temporary abandonment permit from the Indiana DNR. There was no pumping unit on the well, there was merely a pipe sticking out of the ground. (R. 158). Midwest Oil, an interim purchaser, hired a contractor who welded a cover on Egli # 1's casing and then buried it.

Midwest Oil later sold the group of leases of which Egli # 1 was part to Perdue Enterprises. Midwest Oil then became the group's operator. Along the way, other appellees have purchased participating interests.

Later, Jarvis Drilling expressed an interest in purchasing a large number of wells in Kentucky and Indiana,[1] including the group of which Egli # 1 was part, and negotiations for that proposed purchase commenced in March, 1987. Jarvis Drilling was and is a sophisticated oil and gas operator. (R. 554, 569). It had its own experts and paid professionals investigate the properties it sought to purchase from Midwest Oil. (R. 297, 569–570).

During negotiations, Midwest Oil furnished Jarvis Drilling's personnel with a property data document and an oil lease inventory, neither of which mentioned Egli # 1 or its condition. However, Jarvis Drilling was furnished a map showing it as having been plugged. (R. 377). During these negotiations, Jarvis Drilling had access to Midwest Oil's records (R. 392, 396), and they contained a separate file for Egli # 1. (R. 299). Also, other maps in those records showed Egli # 1 was not plugged. (R. 569, 336–337).

The contract for that sale was signed on May 20, 1987, and the permits required by the DNR for transfer of the wells and bonds required by law for unplugged wells were executed by Jarvis Drilling on June 1, 1987, as required by the contract. (R. 392). The transfer permit for Egli # 1 was included, and signed for by Jarvis Drilling's representative. The existence of a transfer permit and cost bond to guarantee the plugging of abandoned wells tells an expert an unplugged well exists. (R. 562).

Two years later in 1989, the DNR determined a well adjacent to Egli # 1 was contaminating the neighborhood's well water and ordered it plugged. At that time,

DNR also ordered Jarvis Drilling to plug Egli # 1. It complied.

Regarding plugging responsibilities, the May 20, 1987, contract provided, in part

... the parties will also execute and deliver such transfer forms pertaining to the well bonds ... so that the SELLERS shall be relieved in all respects of liability incident to plugging of the various wells on the leases described in Exhibit "C".[2]

It also provided, in part

[Jarvis Drilling] specifically agrees that as of the Effective Date they will pay any and all costs and expenses of operation ..., and further that they will assume all claims, demands, actions, or causes of actions (sic) ... resulting from, connected with, or arising out of the use and operation of the PURCHASED INTERESTS in the oil and gas leases described in Exhibit "B" for the production of oil or gas.[3]

From the entry of summary judgment for appellees, Jarvis Drilling appeals.

Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Any doubt as to the existence of a genuine issue of fact must be resolved in favor of the nonmovant. *Lawlis v. Kightlinger & Gray* (1990), Ind.App., 562 N.E.2d 435, 438–439, *reh. denied, trans. denied.* When acting upon a motion for summary judgment, the trial court may consider only those parts of the pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which the movant relies specifically designated by the movant to the trial court at the time the motion is filed. Likewise, the opposing party must specifically designate to the trial court each material issue of fact and related evidence which that party asserts precludes entry of summary judgment at the time its response is filed. Failure to make the required eviden-

---

1. To this day, no one involved in this litigation knows the exact number of wells involved in Midwest Oil's 1987 sale to Jarvis Drilling.

2. Egli # 1 is described in Exhibit C. (R. 55).

3. All of appellees' interests are named in Exhibit B. (R. 31–36).

tiary designations precludes the trial court from considering the failing party's position when making the required determinations prior to ruling on such motion. *Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431, 434. The trial court can enter summary judgment only if the designated evidentiary matter shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

In determining whether there is a genuine issue of material fact precluding summary judgment, all doubts must be resolved against the moving party and the facts properly designated by the party opposing the motion must be accepted as true. *Lawlis, Id.* Even if the facts are undisputed, summary judgment is inappropriate when properly designated evidence before the trial court reveals a good faith dispute as to the inferences to be drawn from such facts. However, factual disputes that are irrelevant or unnecessary will not be considered. A factual issue is "genuine" only when it cannot be foreclosed by reference to undisputed facts and requires a trier of fact to resolve the opposing parties' differing versions. *Lawlis, Id.*

When reviewing the grant of summary judgment, we stand in the shoes of the trial court and apply an identical standard. *Ayres v. Indian Heights Volunteer Fire Department* (1986), Ind., 493 N.E.2d 1229, 1234; *Lawlis, Id.* The court on appeal, however, may not search the record to affirm the trial court. The parties on appeal must specifically designate to this court by appropriate reference to the record on appeal (a) the location of all factual material and supporting evidence specifically designated to the trial court and upon which they rely, and (b) all the documents in which they specifically designated such materials to the trial court. *Jackson v. Blanchard* (1992), Ind.App., 601 N.E.2d 411, 415. Only when those materials demonstrate the basic requirements for entry of summary judgment below are or are not present will we affirm or reverse its entry on appeal.

Jarvis Drilling first argues the trial court erred as a matter of law "by ruling that the signing of an Application For a Permit Transfer precluded recovery for fraud" (Brief of Appellant at 1), then argues there are unresolved material factual issues requiring a trial on the merits. We will discuss the first as included in the second.

Jarvis Drilling claims Midwest Oil was guilty of actual fraud. The elements of actual fraud are

1. a material misrepresentation of past or existing fact by the party to be charged which

2. was false,

3. was made with knowledge or in reckless ignorance of the falsity,

4. was relied upon by the complaining party, and

5. proximately caused the complaining party injury.

*Pugh's IGA v. Super Food Services, Inc.* (1988), Ind.App., 531 N.E.2d 1194, 1197, *reh. denied, trans. denied.*[4] The simple question here is did the complaining party rely on the supposed "misrepresentation"? The clear answer is no, based on the undisputed evidence and reasonable inferences before the trial court when it entered summary judgment in favor of Midwest Oil.

It is a fundamental principle of the law of fraud the representee must have relied upon the statement or representation as an inducement to his action or injurious change of position. *McClellan v. Tobin* (1942), 219 Ind. 563, 39 N.E.2d 772, 775; *Frenzel v. Miller* (1871), 37 Ind. 1. Furthermore, over fifty years ago our Supreme Court defined actual notice as:

'"[a]ctual notice has been divided into two classes, (1) express and (2) implied, which is inferred from the fact that the person charged had means of knowledge which he did not use. Whatever fairly puts a person on inquiry is sufficient

---

4. We pass the initial question of whether the furnishing of conflicting documentation, i.e. a map showing the existence of a "capped" well and other material not showing that well as existing, constitutes an affirmative misrepresentation of fact.

notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascertained. This, in effect, means that notice of facts which would lead an ordinarily prudent man to make an examination, which, if made, would disclose the existence of other facts is sufficient notice of such other facts." '

*Altman v. Circle City Glass Corp.* (1985), Ind.App., 484 N.E.2d 1296, 1298, *reh. denied, trans. denied.* (quoting *Mishawaka St. Joseph Loan and Trust Co. v. Neu* (1935), 209 Ind. 433, 196 N.E. 85, 89–90.

Jarvis Drilling did not rely on Midwest Oil's "misrepresentation." It is undisputed, its own experts and paid professionals investigated the properties Jarvis Drilling sought to purchase from Midwest Oil (R. 297, 569–70), they were given a map showing the existence of Egli # 1 as capped even though other documents did not show Egli # 1 in fact existed, and these experts had access to Midwest Oil's records prior to execution of the contract. They contained a file on Egli # 1. (R. 299). Those records also showed Egli # 1 was not plugged. (R. 569, 336–337). The parties' contract unequivocally provided Jarvis Drilling was to pay "plugging" costs accrued on the wells transferred after the contract's effective date, "... accruing in whole or in part after the effective date ...," and its representative signed the required transfer permit as part of the transaction. Clearly, Jarvis Drilling was or should have been informed of Egli # 1's existence and condition, or at least put on notice by the map, prior to the contract's execution. Thus, it did not and could not rely on Midwest Oil's "misrepresentation."

Without reliance, Jarvis Drilling's cause of action for fraud fails as a matter of law because one of the essential elements thereof, reliance, is missing. *McClellan,* 39 N.E.2d at 775. Absent a cause of action for fraud, the issue of whether Midwest Oil was the agent for the various owners of interests in these wells is irrelevant.

Furthermore, there can be no agency based upon apparent authority ab-

sent some communication, direct or indirect, by the principal to the third party, instilling a reasonable belief in the mind of the third party of such agency relationship. *Pepkowski v. Life of Indiana Insurance Co.,* (1989), Ind., 535 N.E.2d 1164, 1166–1167. Statements or manifestations made by the agent are insufficient to create an apparent agency relationship. *Id.* Additionally, one opposing summary judgment is " 'obliged to disgorge certain evidence' to show the existence of a genuine triable issue." *Hinkle v. Niehaus Lumber Co.* (1988), Ind., 525 N.E.2d 1243, 1245, 1246. One moving for summary judgment must prove the non-existence of factual issues. However, when the moving party files affidavits or other evidence establishing the lack of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate a genuine issue exists for trial. *Johnson v. Padilla* (1982), Ind.App., 433 N.E.2d 393, 396.

Here, Midwest Oil filed affidavits of various owners, specifically denying an agency relationship. (R. 354–376). Jarvis failed to set forth some communication, either direct or indirect, from those other owners to Jarvis. On this ground, Jarvis's claim of an agency relationship must also fail.

Next, Jarvis Drilling postulates because Egli # 1 ceased to produce and was abandoned while being operated by Crystal Oil, Crystal Oil had a statutory duty to plug the well which remained in effect even though the well was transferred to others. Crystal Oil and Midwest Oil independently maintain the DNR's approval of their respective permit transfers effectively absolved them of the responsibility to abandon and plug Egli # 1. Jarvis maintains the trial court erred in granting summary judgment on this issue. We agree.

Our legislature first recognized the duty to plug abandoned wells a century ago. *Bailey v. State* (1904), 163 Ind. 165, 71 N.E. 655, 656; Acts 1893, p. 300, c. 136; Burns' Ann.St. § 7511. Although the statutory scheme and regulating authority has changed throughout history, the duty to plug and abandon a well is codified today

at IC 13–8–10–1. It provides in pertinent part:

An owner or operator shall plug and abandon a well that:

(1) is completed as a nonproductive well;

(2) ceases to produce oil or natural gas;

(3) is no longer operated for the purpose for which it is permitted;

unless the owner or operator is authorized to delay the plugging and abandonment of the well under section 8 of this chapter.

(As amended 1990).

As Midwest Oil correctly notes, 310 IAC 7–1–36 provides

An owner or operator must provide notice in advance to the division of the intention to transfer a permit to another person. Upon approval of the transfer, the new owner or operator is responsible for compliance with IC 13–8, 310 IAC 7–1.5, and this rule and all terms of the permit. The notification to the division shall be completed on a division form. If the new owner or operator fails to submit a fully executed transfer and bond, the permittee of record remains responsible for all requirements of IC 13–8, 310 IAC 7–1.5, and this rule.

While recognizing the above provision, we believe its application as suggested by Midwest Oil is misplaced. We conclude this provision does not absolve a previous owner or operator of liability for plugging and abandoning a well arising during its tenure. Instead, the above provision operates to release a previous owner or operator for liability on its *bond*, rendering the new owner or operator liable on its bond if the transfer is approved. Thus, approval of the various transfers by the DNR does not extinguish liability of the previous operator for a duty arising during its tenure. *See Salmon Corp. v. Forest Oil Corp.* (1974), Okla., 536 P.2d 909; *Loriaux v. Corporation Commission* (1973), Okla., 514 P.2d 941.

Therefore, upon approval of the transfer from Crystal Oil to Midwest Oil, Midwest Oil became responsible on its bond for compliance with IC 13–8–10–1. When the DNR approved Midwest Oil's bond, Crystal Oil's obligation on its bond was discharged. *See* 310 IAC 7–1–19(c). However, Crystal Oil's obligation to plug the abandoned well as required during its tenure as operator was not. The same is true of the transfer between Midwest Oil and Jarvis. In Indiana, an owner or operator of a well has the duty to plug an abandoned well in compliance with DNR regulations when the conditions of IC 13–8–10–1 are present. Transfer to a third person does not extinguish that obligation.

Midwest Oil also contends the contract renders Jarvis liable for the costs of plugging the well. However, specifically regarding plugging responsibilities, the May 20, 1987, contract provided, in pertinent part:

15. At the closing, the parties will also execute and deliver such transfer forms pertaining to the well *bonds* ... so that the SELLERS shall be relieved in all respects of liability incident to plugging of the various wells on the leases described in Exhibit "C".

. . . . .

17. The BUYER specifically agrees that as of the Effective Date they will pay any and all costs and expenses of operation (including reimbursement to MIDWEST for sums expended for operations after May 1, 1987) and further that they will assume all claims, demands, actions, or causes of actions [sic] *accruing in whole or in part after the effective date* resulting from, connected with or arising out of the use and operation of the PURCHASED INTERESTS in the oil and gas leases described in Exhibit "B" for the production of oil or gas....

(R. 25). (Emphasis added).

Jarvis agrees if more than one party has a statutory duty to plug, those parties may determine among themselves who shall bear the expense. Brief of Appellant at 27, 28. *See Houser v. Brown* (1986), 29 Ohio App.3d 358, 505 N.E.2d 1021, 1025. However, contrary to Midwest Oil's assertion, Jarvis did not contract to bear the plugging expenses for a well for which the obli-

gation to plug and abandon did not "Accru[e] in whole or in part after the effective date" of the contract. (See above contract provision 17). From the facts before us, it is clear Crystal Oil abandoned Egli # 1, without obtaining a temporary abandonment permit from the Indiana DNR. Midwest Oil then acquired the well and hired a contractor who welded a cover on Egli # 1's casing and then buried it. Ultimately, Jarvis acquired the well and properly plugged it under orders from the DNR. The obligation to plug it arose when the conditions of IC 13–8–10–1 were present, not when the DNR ordered Jarvis to do so. Thus, Crystal Oil is ultimately liable for Jarvis's costs in correctly plugging Egli # 1 on common law principles.

 Jarvis also argues it should be allowed to recover from Crystal Oil under a statutory theory based on IC 13–8–10–15. We disagree.

IC 13–8–10–15 provides:

A person who has no obligation to plug, abandon, replug, or repair a well, but who does so under section 12, 13, 14, or 16 of this chapter, may recover in a civil action against any responsible person the reasonable expenses of the remedial action.

Clearly, Jarvis did have such an obligation. Therefore, this statute does not provide a means of recovery. However, Jarvis's obligation to plug the well originates with Crystal Oil's failure to plug the abandoned well, as well as Midwest Oil's failure to properly do so, both of whom were statutorily obligated so to do. Although the duty to properly plug and abandon the well initially arose during Crystal Oil's tenure, thereafter, each party meeting the statutory requirements had the duty to properly plug it. Whether that duty was properly delegated by Crystal Oil to Midwest Oil is not before us. The theory of recovery between the parties here is limited to common law indemnity.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

CHEZEM, J., concurs.

SULLIVAN, J., dissents in part and concurs in part with separate opinion.

SULLIVAN, Judge, dissenting in part and concurring in part.

I concur in the second portion of the majority opinion which reverses the summary judgment with respect to Crystal Oil's possible liability for failing to plug the Egli # 1 well during Crystal Oil's possession and control of the well.

I dissent with respect to the majority's holding that, as a matter of law, Jarvis Drilling did not rely upon various misrepresentations made by Midwest Oil. This conclusion was reached upon grounds that information was available to Jarvis Drilling which would have shown that Egli # 1 existed and was not capped.

The reasonableness of reliance under circumstances such as those before us is a question of fact, not a question of law determinable upon summary judgment. *Scott v. Bodor, Inc.* (1991) 5th Dist. Ind. App., 571 N.E.2d 313; *Medtech Corp. v. Indiana Insurance Co.* (1990) 1st Dist. Ind.App., 555 N.E.2d 844; *Captain & Company, Inc. v. Stenberg* (1987) 4th Dist. Ind.App., 505 N.E.2d 88; *Plumley v. Stanelle* (1974) 2d Dist. Ind.App., 311 N.E.2d 626.

It is not entirely clear that, as stated by the majority, examination of the Egli # 1 well file would have disclosed that the well was not capped. Thus even if Jarvis Drilling had examined the file, it may not have learned that the well was not plugged. Additionally, in light of the prior representations and documents provided by Midwest Oil, it would be unreasonable to impose upon Jarvis Drilling a duty to check all sources of information, remote or otherwise, in order to see if Midwest had misrepresented the actual situation. To hold that Jarvis Drilling, in the exercise of due diligence, was obligated to make sure the well was plugged, is to hold that all purchasers must assume that all sellers misrepresent all aspects of the transaction.

A reasonable trier of fact might well conclude that the transfer form for Egli # 1, included as it was with some seventy-eight other such permit transfer forms, would not necessarily trigger a duty of inquiry on the part of Jarvis Drilling. A reasonable trier of fact could find that Jarvis Drilling was entitled to credit previous information that the well was plugged and was not required to assume that the existence of a transfer form for Egli # 1 necessarily meant that the well was unplugged.

Similarly, there are factual issues or differing inferences permissible with reference to whether an agency relationship existed between Midwest Oil and some or all of the other defendants.

In essence then, there are sufficient factual issues requiring submission of the fraud allegations to the trier of fact. I would in all respects reverse the summary judgments entered for the various defendants.