MISHAWAKA ST. JOSEPH LOAN & TRUST COMPANY ET AL.
*v.* NEU, GUARDIAN ET AL.

[No. 26,574.   Filed May 23, 1935.   Rehearing denied
February 3, 1936.]

434

*Walter R. Arnold, Ralph S. Feig, Harmon & Wider* and *Flora C. Huffman,* for appellants.

*Raymer & Olds,* for appellees.

FANSLER, C. J.—Appellees began this action against appellants, Herbert R. Huffman and Flora C. Huffman, his wife, for specific performance of a contract to convey certain real estate consisting of a five-acre tract of ground and the residence thereon. Appellants, Mishawaka St. Joseph Loan & Trust Company, under the name of Mishawaka Loan and Trust Company, and the

Penn Finance & Building Company, Inc., were made parties defendant to answer as to their rights under certain mortgages on the real estate in question executed to them by the Huffmans, which plaintiffs claim are of no force and effect as liens on the premises. The Huffmans answered in general denial. The finance company and the trust company answered, asserting their mortgages as liens upon the premises, and, by separate paragraphs of cross-complaint, prayed foreclosure of their mortgages or subrogation to the rights of the holders of certain mechanics' and materialmen's liens, and a lien for purchase money under the contract between the Huffmans and one Stryker, which were paid out of the money borrowed from them by the Huffmans.

There were special findings of facts, on which the court rendered conclusions of law. There was a decree that Herbert R. Huffman execute a warranty deed to the plaintiffs for the property in question, and in default thereof a commissioner was named to make the deed; that the trust company and the finance company recover of the Huffmans $2,466.54 and $1,329.46, respectively, on the notes and mortgages sued on, and that they release their mortgages of record, and in default thereof a commissioner was named to do so; that the plaintiffs execute to Herbert R. Huffman a warranty deed for certain real estate, which under their contract they were to convey to him as part of the purchase price for the property in question, and in default thereof a commissioner was named so to do; and quieting title in plaintiffs as against Flora C. Huffman.

The only errors assigned are predicated upon the conclusions of law.

The facts appearing from the special findings, necessary to a consideration of the questions presented, are: On June 15, 1929, Arthur J. Stryker and wife were the owners of the five-acre tract in question. Appellant

Herbert R. Huffman was at that time engaged in developing real estate and building homes, under the name "Home Modernizing Company." Some time between June 15, 1929, and September 16, 1929, Herbert R. Huffman made an agreement with the Strykers, "the exact nature of which is not shown by the evidence, but which was in substance that said Herbert R. Huffman might purchase said 'five-acre tract' at a price agreed upon, and that title thereto was to be retained until the said purchase price was paid in full and that said Herbert R. Huffman might, in the meantime, enter upon such 'five-acre tract' and erect improvements thereon; that pursuant thereto said Herbert R. Huffman did enter upon said 'five-acre tract' about July 1, 1929, and did erect thereon a dwelling house, garage, well and other residence conveniences under and by virtue of such right aforesaid, which improvements were completed on or before September 12, 1929, with the exception of the hanging of a door." On June 15, 1929, Huffman entered into a contract with the Downeys, by the terms of which it was agreed that Huffman would sell the land in question to the Downeys, and that he would improve the same by building a residence and garage thereon; that upon completion of the improvements he would convey the property to the Downeys, free and clear of encumbrance. As consideration, the Downeys agreed to pay, and did pay, $100 in cash upon the signing of the contract, and at the same time conveyed to Huffman three certain lots, with the agreement that, when the improvements were completed and ready to turn over, the Downeys were to convey certain additional real estate consisting of a residence and other buildings, and pay the further sum of $150. About July 1, 1929, Huffman began the construction of the improvements and continued the work to completion, with the exception noted, on September 12, 1929, and on Septem-

ber 14, 1929, he turned over the complete possession of the property to the Downeys. It is found that the "plaintiffs Downeys' residence was established and their possession perfected on said 'five-acre tract' on September 14, 1929, and they have ever since, had and still do have, open, notorious, exclusive and complete possession thereof, and have occupied the same as a residence." It was found that Downeys had moved various articles of personal property to the premises from time to time, but "that the great bulk of their personal belongings were not moved to said 'five-acre tract' until said September 14, 1929." On or about September 12, 1929, Huffman negotiated with the trust company and the finance company for a loan on the property, and, on September 12, 1929, before the Downeys were in possession, representatives of those companies inspected the premises, but did not inspect the inside of the dwelling, and found no one in possession of the premises. On September 16, 1929, Herbert R. Huffman, representatives of the Strykers, the appellant mortgagees, and of the materialmen and laborers, who had furnished material and labor which had gone into the construction of the buildings in question, and which had been furnished "between July 17, 1929, and September 16, 1929, and who had claims that were due and unpaid and owing by Herbert R. Huffman," amounting to $1,404.45, had a meeting. The representative of the Strykers "had in his possession for delivery upon payment of the balance of the purchase price, amounting to $1,125.00," a warranty deed for the property to Herbert R. Huffman as grantee. At that meeting, on the 16th day of September, 1929, the Strykers' deed was delivered to a representative of the appellant mortgagees in the presence of Huffman. Huffman, his wife joining, executed and delivered to the trust company a mortgage for $2,000, and a second mortgage to the finance company for $1,000, by

the terms of which both agreed to pay the notes executed by Huffman and which were secured thereby. Out of the proceeds of the loans, the mortgagees paid to the representative of the Strykers "the balance of the purchase price of said 'five-acre tract' in the sum of $1,125.00," and the claims of materialmen and laborers amounting to $1,434.45. Certain evpenses of abstracts, examining titles, recording fees, etc., were deducted, and the balance was paid to Herbert R. Huffman. All of those transactions were found to have been completed "contemporaneously in all respects." The deed from the Strykers to Herbert R. Huffman and the mortgages were filed for record on September 18, 1929. Neither of said mortgagees had on September 16, 1929, any actual knowledge of the rights of the plaintiffs in the property in question. On the 5th day of December, 1929, appellees tendered the Huffmans their warranty deed for the remaining lots, which they were to convey as part of the purchase price, and demanded a deed to the property in question. The tender was not accepted, and the demand was not complied with. On September 14, 1929, James Downey knew who held the legal title to the property.

Appellees moved to dismiss the appeal on the ground that the Mishawaka St. Joseph Loan & Trust Company was not a party to the proceeding below. The Mishawaka Loan and Trust Company was made a party defendant. The special findings refer to that company as "now the Mishawaka-St. Joseph Loan & Trust Company." The judgment described the company in the same manner. We are bound by the judgment of the court that the corporation is the same and that the name was changed. The assignment of errors in the present name is sufficient. In parts of the record there is a reference to the Mishawaka Loan and Trust Company as trustee. It clearly appears, however, that

whatever cause of action or defense this company had was in its own right, and in such case the descriptive words may be disregarded as surplusage. *Marion Bond Co., Trustee* v. *Mexican, etc., Co.* (1902), 160 Ind. 558, 65 N. E. 748; *Ditton* v. *Hart* (1911), 175 Ind. 181, 93 N. E. 961.

Dismissal is asked upon the ground that Shreiner and Son, Inc., was a party to the proceeding below and to the judgment, and is not made a party to the assignment of errors, but we do not find its name mentioned in the judgment and decree. The other specifications in the motion to dismiss refer to the manner of preparing the transcript and briefs, which we find comply with the rules. The motion to dismiss is overruled.

Upon the merits of the controversy, appellants say that they make no contention against the universally accepted doctrine that, when persons deal in respect to real estate, "the fact that a third person is resident on the premises is, of itself, constructive notice of his claim to all persons who might wish to purchase," and that therefore they concede that the mortgagees "constructively knew, not that appellees were in possession of the premises, but that appellees had made a contract with Herbert Huffman who himself had no title or enforceable interest in the property at the time."

Nowhere in the decisions or the textbooks do we find a reference to such a situation as we have here, nor an attempt to fix the time at which an examination of the property must be made to discover whether someone is in possession, in respect to the time of the consummation of the contract of purchase. But to adopt appellants' theory, upon such a state of facts as is presented here, would commit this court to a position much broader than we find to have been adopted in any of its decisions; and, since we must assume a position which

will be regarded as precedent, it is necessary to somewhat limit what is generally said to be the universal rule.

The question presented is, whether one who has examined the property which he proposes to purchase, and has found it in possession of one claiming to be the equitable owner, and has ascertained the character of title claimed by the one in possession, and who, within a short time thereafter, deals with and purchases from the one whom he found in possession, is chargeable with notice of the possession of another equitable claimant who took possession after the examination of the property but before the consummation of the sale or mortgage.

It is generally said that open, visible, continuous, notorious, unequivocal, unambiguous, and exclusive possession of land, a possession which would be naturally observed and known, is constructive notice to a prospective purchaser of the rights of the one in possession, and that knowledge of the possession on the part of the purchaser is not necessary; that notice in such a case is a legal deduction from the fact of possession; and it has been held that possession by an equitable claimant at the time of the consummation of the sale is as effective to charge the purchaser with notice as the recording of an instrument prior to the recording of the purchaser's conveyance is effective to charge him with notice of prior rights. If this be true, it is quite impossible for a purchaser of lands at some distance from the recording office to have absolute protection in his title, since, if he completes the purchase in the office where conveyances are registered, in order to insure that no prior conveyance shall be registered, he cannot be on the land to insure that someone claiming an equitable title has not taken possession since he inspected it but before his purchase is consummated. As a basis for the rule that

a purchaser will be charged with notice of the equitable rights of one in possession of land, it is said that "it is not to be supposed that any man who wishes to purchase land honestly will buy it without knowing what are the claims of a person who is in the open possession of it, and it is reasonable, if men will buy in such cases without inquiry, that they should be presumed to have known everything which they might have learned upon due inquiry." 27 R. C. L. 719. But a court of conscience cannot attribute dishonesty, bad faith, or even a lack of reasonable diligence or care, to a purchaser because he has not done the impossible by being in two places at once. The statute which gives precedence to the purchaser whose conveyance is first recorded cannot be avoided by a court of equity. But a rule that would charge a purchaser with knowledge of the possession of an equitable claimant, regardless of the diligence and care with which the prospective purchaser examined the land and sought to discover whether there was a claimant in possession, can and should be avoided. Perhaps the difficulty which confronts us arises out of a misapprehenion as to the character of knowledge with which the purchaser is chargeable on account of possession by an equitable owner. It is generally said to be *constructive* notice. But, in strictness, there is no constructive notice except as provided by statute. *Burck* v. *Taylor* (1894), 152 U. S. 634, 14 S. Ct. Rep. 696; *Flint River Steamboat Co.* v. *Roberts* (1848), 2 Fla. 102, 48 Am. Dec. 178. On the other hand, actual notice has been divided into two classes, (1) express and (2) implied, which is inferred from the fact that the person charged had means of knowledge which he did not use. "Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if he omits to inquire, he is then chargeable with all the facts which, by a proper inquiry, he might have ascer-

tained. This, in effect, means that notice of facts which would lead an ordinarily prudent man to make an examination which, if made, would disclose the existence of other facts is sufficient notice of such other facts." 20 R. C. L. 346, and cases cited. In *Webb* v. *John Hancock Mutual Life Ins. Co.* (1904), 162 Ind. 616, 69 N. E. 1006, this court used the term "constructive knowledge," but it is said (p. 634) : "It would appear, when all of the facts and circumstances of which appellee had knowledge are considered, that its neglect to make further inquiry can only be explained upon the theory that it desired to remain ignorant;" and further: ". . . The question is, what knowledge under all of the circumstances ought to be imputed to it in respect to the particular point here involved." So that it is clear from the whole opinion that the court was not dealing with a case involving constructive notice, but with imputed or implied knowledge. Again, in *Field* v. *Campbell* (1904), 164 Ind. 389, 72 N. E. 260, the term "constructive notice" is used, where the question was, whether certain facts within the knowledge of an agent could be imputed to the principal. "Constructive notice is a legal inference, while implied actual notice is an inference of fact." 20 R. C. L. 341, and cases cited. It has been said that failure to notice facts of which one has been put upon inquiry is a species of fraud. *Lodge* v. *Simonton* (1831), 2 Penn. & W. 439, 23 Am. Dec. 36. And this is entirely consistent with the rule that one who fails to examine land which he is about the purchase, and to inquire as to the rights of one in possession, is not acting in good faith and will not be treated as a bona fide purchaser. In equity, means of knowledge, with the duty of using them, are equal to knowledge itself. *Cordova* v. *Hood* (1872), 17 Wall. (U. S.) 1, 21 L. Ed. 587.

The question, then, is whether the purchaser has

knowledge, or means of knowledge, of which he did not avail himself, so that knowledge will be implied. Appellants were chargeable with knowledge that the property might be occupied by some person claiming to be the owner thereof; they acted upon their means of ascertaining the fact by an examination of the property, and found Huffman in possession. Having found some person in possession, they were bound to inquire as to his rights. They did inquire and discovered the equitable rights claimed by Huffman. And if possession of the Downeys had not intervened, between the time of the examination of the property and the time of the consummation of the mortgages, there would be no question presented. It seems clear that if appellants had examined the property ten minutes before the consummation of the mortgage contracts, and found Huffman in possession, and had then hastened to the office of the recorder of conveyances in order to ascertain that no prior conveyance had been filed, and consummated their contract there, it could not be said in good conscience that they were not honestly and diligently seeking to avail themselves of every means open to them by which the rights of equitable or legal claimants might be ascertained. Neither the law nor equity will impute to a person knowledge of facts that he has not had a reasonable opportunity to ascertain. He must use every reasonable means to ascertain such facts as may be open to his observation, but to require that he procure all possible information, and that he be both in the office of the recorder of conveyances to insure that no prior conveyance may be offered, and also upon the land to insure that no one will occupy it under a claim of right, both at the moment of consummating his purchase or loan, would be to require the impossible. All rules in equity are sufficiently elastic to permit justice and equity to be done in each particular case. It is true that,

if a prospective purchaser examines the property, and a year elapses before his purchase is consummated without a further examination, he might be chargeable with bad faith. Whether knowledge of possession will be imputed in any given case must be a question of fact.

Strength is lent to the position by the language of the decisions which characterizes the possession of which one must take notice, with the requirement that it be open, visible, continuous, notorious, unequivocal, unambiguous, and exclusive, or such as would be naturally observed and known. No such language is needed to convince that equity and justice cannot countenance a rule which would make secret, furtive, or concealed possession notice of the rights of the possessor, but it evidences a conscienceness that a purchaser who uses ordinary care and diligence and prudence to ascertain the facts concerning the property which he contemplates purchasing should not be charged with knowledge of that which is not open and readily observable.

In weighing the equities between the parties, all of whom except Huffman seem to have acted in perfect good faith, consideration must be given to the fact that the Downeys, four months before the mortgagees acquired their rights, entered into a contract with Huffman out of which their rights arose, and that this contract was either insufficient to convey title under the statute of frauds, or if sufficient might have been recorded in which case it would have been constructive notice to the mortgagees independent of possession of the premises. Under this state of facts, it would seem that the mortgagees were more vigilant in protecting their rights, and "equity aids the vigilant."

In determining whether knowledge of possession shall be imputed, the well-known and well-recognized practices of reasonably prudent men engaged in such affairs, in circumstances and surroundings comparable to the

circumstances, should be given consideration. In ordinary transactions a prospective purchaser will examine the property involved before agreeing upon a purchase price, and, after a tentative agreement, the purchase money and the conveyance will not be transferred until opportunity is had to complete abstracts of the record title. In transactions involving considerable sums which must be arranged for, at least some hours, if not days, may be required between the meeting of the minds of the contracting parties and the consummation of the contract by payment and delivery of a conveyance.

In this case the record title to the property was in the Strykers. Herbert R. Huffman had erected a new residence and other improvements upon the property, which were practically, but not entirely, completed on the 12th day of September, 1929, and was in possession upon that date when the mortgagees examined the property with a view to lending money to Huffman secured by a mortgage on the property, the primary purpose of which loans was to pay the purchase price so that Huffman might procure the title, and to pay the liens of laborers and materialmen who had contributed to the construction of the improvements, which must have been obviously new. No doubt the agents of the mortgagees, who examined the property, were required to report their observations before the loans were approved, and when they were approved it was necessary to arrange for a meeting with the Strykers, and the preparation of a deed, and for the ascertaining of those having claims for labor and material and arranging for their attendance. An investigation of the record title would be necessary, and opinions of attorneys upon examination of the abstract. All of these things seem to have been done, and the transaction was consummated on the 16th day of September, 1929. The fact that the Strykers, and the materialmen

and laborers having claims, were caused to be present at the time the loans were made, and that the mortgagees paid them directly without turning the money over to Huffman, strongly indicates that the mortgagees were seeking in good faith to protect the rights of all who had claims upon the property, including Huffman, whom they had found in possession when they inspected the property. In the meantime, on the 14th day of September, 1929, appellees occupied the property, which is described in the contract as "a certain five-acre tract of land located on the Conn Road and more fully described as the tract in the north edge of the woods as the same is staked as a part of the land of Arthur Stryker," and the special findings recite that, beginning with that date, and continuously thereafter, they had "open, notorious, exclusive and complete possession thereof," which seems to have been considered the ultimate fact necessary to charge the mortgagees with knowledge of the Downeys' possession and the character of their claims, but such is not the case.

Appellees assert an equitable title against the otherwise prior liens of the mortgagees. They thus assumed the burden of showing that the mortgagees had knowledge of their rights at the time they took their mortgages, or that, through appellees' possession, appellants had means of knowledge which they ignored. From what we have said, it follows that, in view of the facts in this case, the question of whether appellees' possession was for a sufficient length of time, and that the circumstances were such, in view of appellants having once examined the premises, as to impute to them knowledge of appellees' possession, must be determined from the standpoint of what effect the possession would have upon men of reasonable prudence in the exercise of reasonable care; whether the facts indicate such a neglect as would impute to appellants lack of a desire or inten-

tion to know the facts; in other words, bad faith. This is a question of fact. There is a finding that appellants had no actual knowledge of the rights or possession of appellees. There is no finding that the mortgagees were not good-faith holders, without notice, and no facts are found which are sufficient as a matter of law to impute knowledge to appellants, and therefore appellees did not sustain the burden which was upon them. Under all of the facts specially found, the mortgagees must be treated as having taken their mortgage liens in good faith and without notice of appellees' equities.

The lien of the mortgages is sustained, but if it were not so the mortgagees would be entitled to a lien for the money advanced by them to pay Stryker's vendor's lien, and the materialmen and laborers. Huffman was primarily liable for these obligations, and he had an interest in the property which he was entitled to protect. The mortgagees therefore would be entitled to be subrogated to his rights. "The right of subrogation is not founded upon contract, express or implied, but upon principles of equity and justice, and includes every instance in which one party, not a mere volunteer, pays a debt for another, primarily liable, and which in good conscience should have been paid by the latter. . . . A person who may be compelled to pay a debt, or the protection of whose property or interest requires that he pay it, is not a mere volunteer. . . . Nor is one who pays a debt or advances money for the purpose, at the request of the debtor, a mere volunteer." *Warford* v. *Hankins* (1898), 150 Ind. 489, 493, 50 N. E. 468.

Appellees were claiming to be, and are here asserting that they were, the equitable owners of the real estate in question. They contracted with Huffman that improvements should be made upon the property. Huffman contracted for the labor and

material in his own name, it is true, but for the benefit of the property, which appellees claim as equitable owners. Appellees did not record their contract. They relied upon the good faith and credit of Huffman. They permitted him to contract in his own name with respect to the property. To the materialmen and laborers, and to the appellant mortgagees, Huffman must have appeared to be the principal debtor. Undeniably he was seeking the payment of the claims of the materialmen and laborers, and the payment of the purchase price to Stryker, and offering a mortgage lien to secure the funds paid to them. Huffman must have appeared to be the principal party in interest. The appellees, it is true, contracted with Huffman, who had no legal title to the property, that they should take it free and clear of encumbrance, but they relied upon this unsecured word. The mortgagees did not advance the money which procured the legal title upon the bare credit of Huffman, and they, doubtless, would not have advanced the money without the payment of the claims of materialmen and laborers, who had a right to a lien. They advanced it only upon the security of the property. Appellees are in no worse position than they were before. They relied upon the credit of Huffman unsecured. They are entitled to a judgment against him.

Flora C. Huffman, the wife of Herbert R. Huffman, signed the mortgages. There was judgment against her, and in favor of the mortgagees, for the amounts due under the mortgages. There is no finding that she had any knowledge of the transactions between her husband and the appellees, and she must be treated as having signed the mortgages, which made her liable for the amount of the notes secured, in good faith, without knowledge of the appellees' equities, and relying upon the security of the property to protect her from liability. As between Mrs. Huffman and the appel-

lees, who parted with part of the consideration for the property without security, and relying entirely upon the personal responsibility of Herbert R. Huffman, the equities are with Mrs. Huffman, and require that the mortgages be upheld as valid liens. But her right to claim an inchoate interest in the land presents another question. Equity looks to the substance and not the form. The facts disclose that Herbert R. Huffman sold the property before he bought it, and accepted part of the consideration from the appellees before he paid any consideration to the Strykers. If the appellees had paid all of the consideration to Huffman, no doubt they might have maintained an action to procure the legal title to be vested in them directly from the Strykers by paying anything that might be due under Huffman's contract of purchase with the Strykers, in which event no legal title would have vested in Huffman at any time. It was said in *Sharts* v. *Holloway* (1898), 150 Ind. 403, 407, 50 N. E. 386:

"... if a husband receives a conveyance of land on which there is an outstanding lien, or an equity that is binding on him, the wife has no inchoate interest in such land as against such outstanding equity or lien. . . . And, as his wife acquired her interest through the husband, it is subject to all the liabilities the husband's title is subject to when it comes into existence."

· Flora C. Huffman may not assert an inchoate interest in the property. Her rights will be fully protected by judgment subjecting the property to sale for the payment of the mortgages.

The facts are fully found and the rights of the parties fully appear. Appellants, Mishawaka St. Joseph Loan & Trust Company and Penn Finance & Building Company, Inc., are entitled to a decree foreclosing their mortgages and to judgment against Herbert R. Huffman and Flora C. Huffman. The decree should require

the conveyance of the mortgaged property to appellees by Huffman and wife, or by a commissioner; and a conveyance by appellees to Huffman of the real estate which constitutes the balance of the purchase price under their contract with Huffman; this real estate, and the real estate already conveyed as part of the purchase price by appellees, to be subject to the liens of mortgagees' judgments and exhausted, together with any other property of Huffman subject to execution for the payment of the judgment, before the mortgaged property shall be liable therefor. The mortgaged property should be exhausted, however, before execution issues against the property of Flora C. Huffman. The costs should be adjudged against Herbert R. Huffman.

Judgment reversed, with instructions to restate the conclusions of law, and enter judgment not inconsistent with this opinion.

---

TREANOR, J., concurring in part, dissenting in part.

I concur in the result to the extent that I believe that the appellant, Mishawaka St. Joseph Loan & Trust Company is entitled to Stryker's vendor's lien and to the lien of the materialmen and laborers. But I cannot accept the conclusion of the majority respecting the legal consequences of possession. It is undisputed (1) that appellant examined the premises on September 12, 1929, at a time when Huffman, a building contractor, was completing a residential building thereon, (2) that the Downeys moved in and occupied the residence on September 14, 1929, and (3) that the mortgage in question was not executed to the trust company until September 16, 1929. The court found that the "plaintiff Downey's residence was established and their possession perfected on said 'five-acre tract' on September 14, 1929, and that they have ever since had, and still do have, open, notorious, exclusive, and complete posses-

sion thereof, and have occupied the same as their residence." As I understand the majority opinion it holds that the appellant Mishawaka St. Joseph Loan & Trust Company did not have notice of Downey's possession as a matter of law because, in the opinion of the majority, the facts were not such as to put upon appellant the duty of examining the premises after the inspection of September 12th. As stated in the majority opinion: "There is a finding that appellants had no actual knowledge of the rights or possession of appellees. There is no finding that the mortgagees were not good-faith holders, without notice, and no facts are found which are sufficient as a matter of law to impute knowledge to appellants, and therefore appellees did not sustain the burden which was upon them. Under all of the facts specially found, the mortgagees must be treated as having taken their mortgage liens in good faith and without notice of appellees' equities." The writer understands that there is a rule of law to the effect that "open, notorious, exclusive and complete possession" of premises constitutes constructive notice to all the world of such possession; and that a prospective acquirer of an interest in premises so possessed is charged with knowledge of the interest of the possessor to the extent that reasonable investigation would have disclosed the same. In short, in the opinion of the writer, possession of the sort which the court found to exist in the instant case is as conclusive notice to all the world of the interest of the possessor in the premises as is the notice given by a recorded deed or mortgage. In one case the notice is a result of a rule of common law; in the other, of a rule of statutory law.

It is true as suggested in the majority opinion that the instant suit is a suit in equity and consequently calls for a proper application of rules of equity, but in the opinion of the writer the effect of the majority opinion

is to transmute a well recognized rule of property law into a standard of conduct. Since on the facts both the Downeys and appellant were acting equally in good faith it is not a case where equity will deny a party a legal advantage because of unconscionable conduct.