**S & S ENTERPRISES, Appellant–
Plaintiff,**

v.

**MARATHON ASHLAND
PETROLEUM, LLC,
Appellee–Defendant.**

**No. 49A02–0212–CV–1033.**

Court of Appeals of Indiana.

Nov. 20, 2003.

C. Duane O'Neal, Todd A. Richardson, Lewis & Kappes, Indianapolis, IN, Attorneys for Appellant.

Jan M. Carroll, Michelle L. Blank, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In June 2000, S & S Enterprises ("S & S") filed its Verified Complaint for Dam-

ages and Injunctive Relief against Marathon Ashland Petroleum, LLC ("Marathon"). S & S alleged that Marathon was trespassing on its property and sought injunctive relief accordingly. S & S further alleged that the parties disagreed on the location of the Easement granted to Marathon in 1972 by S & S's predecessor in title, Ramada Indiana, Inc. Specifically, while the Easement itself grants Marathon an easement along the west property line, a Rider to the Easement grants Marathon an easement along the east property line. Marathon filed its Answer and requested that the trial court determine the actual location of the easement.

In March 2002, S & S moved for summary judgment, arguing that the Rider governs the easement's location. Marathon then filed its cross-motion for summary judgment, arguing that the Rider was the product of mutual mistake and should be reformed to reflect the parties' intentions, which was to grant an easement along the west side of the property line. On November 26, 2002, the trial court issued its Order and found that "mutual mistake existed in the execution of the Easement and Rider," denied S & S's summary judgment motion, and granted Marathon's motion. S & S now appeals and presents a single issue for review: whether the trial court erred when it granted Marathon's summary judgment motion and reformed the Rider based on mutual mistake.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In 1972, Ramada Inns, Inc. embarked on a project to build a hotel near the Indianapolis airport on a 7.5 acre parcel in the Park Fletcher Industrial Park. For that project, Ramada Inns, Inc. formed Ramada Indiana, Inc. ("Ramada"), an Indiana corporation. On May 12, 1972, Ramada and Marathon Oil Company entered into an Option to Purchase in which Ramada granted Marathon Oil Company an option to purchase a portion of the 7.5 acre parcel. Marathon Oil Company exercised the option and took title to a 0.587 acre parcel ("Marathon Parcel") by Corporate Warranty Deed ("the Deed") dated December 21, 1972, which was recorded in the Marion County Recorder's Office on January 23, 1973.

Marathon Oil Company planned to operate a service station on the Marathon Parcel. When Marathon Oil Company exercised its option to purchase, Ramada agreed to grant Marathon Oil Company a non-exclusive twenty-five-foot easement for purposes of a common driveway to serve both the service station and the hotel. Specifically, on November 13, 1972, Ramada executed the Easement, which provided in relevant part: "Marathon [Oil Company] shall have a non-exclusive 25 foot easement on the *West* property line in order that Marathon [Oil Company] and Ramada may have a common joint driveway use to serve both the service station and the Ramada Motor Hotel located in the Park Fletcher Industrial Park." Ramada amended the Easement with a Rider, which provides:

The Easement is hereby amended in the following manner:

Paragraph 1 is deleted and the following is inserted in lieu thereof:

1. [Marathon Oil Company] shall have a non-exclusive twenty-five (25) foot wide easement running from Bradbury Street along the *East* property line . . . in order that [Marathon Oil Company] and Ramada shall have a common joint driveway use to serve both the service station and the Ramada Motor Hotel located in the Park Fletcher Industrial Park.

(Emphasis added). Ramada alone executed both the Easement and the Rider, and those documents were recorded on January 23, 1973.

Before Ramada executed the Easement in November 1972, Robert J. Isbell, Ramada's vice president, reviewed and approved the Marathon Plot Plan dated July 14, 1972. The Marathon Plot Plan was prepared showing north at the bottom, south at the top, west on the right, and east on the left. Isbell also reviewed and approved a survey dated August 29, 1972, prepared by Weihe Engineers, Inc. Unlike the Marathon Plot Plan, the Weihe survey showed north at the top, south at the bottom, west on the left, and east on the right. However, both the Marathon Plot Plan and the survey show that Bradbury Street borders the Ramada property and the Marathon Parcel to the north, and that Ramada's property surrounds the Marathon Parcel on all remaining sides. There are two easements, electrical and drainage, located on Ramada's property to the east of the Marathon Parcel.

In 1982, David Ayres began operating the Marathon service station, and he was familiar with the station under its prior operator because he was employed at another station nearby. When Ayres took over at the Marathon station, the station and the hotel shared a common driveway on the west side of the station, between the station and the hotel. On the east side of the station there was a steep drainage ditch, incapable of being used as a driveway. While Ayres operated the station, the station's sales volume tripled, which resulted in an increase in traffic coming and going from the station. That increase in traffic caused delays for cars waiting to enter or exit the hotel parking lot from the common driveway between the two businesses. In early 1984, the Ramada management erected large concrete barricades

to close off the entrance and exit to the hotel parking lot from the common driveway between the two businesses. Those barricades routed traffic from the Ramada parking lot out its main entrance farther west on Bradbury Street. The barricades did not obstruct ingress and egress from Bradbury Street to the service station.

In 1986, Ramada conveyed its parcel by Special Warranty Deed to S & S. S & S's title search conducted in connection with the conveyance disclosed the recorded Easement and Rider. Prior to the sale, S & S inspected the property. A survey completed two weeks after the sale showed the location of the "25' INGRESS–EGRESS EASEMENT—Inst. 73–4329" on the east side of the Marathon Parcel. "Inst. 73–4329" refers to the recorded Easement and Rider.

In 1987, a United States Air Force jet crashed and destroyed the hotel on S & S's property. Ayres, who continued to operate the Marathon service station, had to remove some of the barricades along the west property line so that the government could use the service station as a staging area for the recovery effort. Ayres and his employees later returned the barricades to their original location.

In 1997, Marathon Oil Company transferred its interest in the Marathon Parcel to Marathon by Quitclaim Deed. In 1999, a fire damaged the Marathon service station, which caused the business to close. In January 2000, while Marathon was in the course of rebuilding the station, William E. Cramer of Marathon sent S & S's legal counsel a letter, which provides in part:

> [Marathon] owns the subject property located directly east of S & S Enterprises [sic] parcel along Bradbury Street. Upon review of our survey, …, we found that concrete barriers have been erected across an area where Marathon retains easement rights. For your re-

view, I've attached a copy of the easement agreement entered into between Marathon Oil Company and [Ramada], predecessor to S & S Enterprises.

Marathon plans on rebuilding this facility, and this letter is to serve as notice that Marathon requires complete access to the 25′ easement area. Once Marathon begins construction of the new facility, we are willing to assist your tenant [1] with the relocation of these barriers.

S & S gave Marathon permission to move the barricades, and Marathon moved them to a location allowing full use of the area west of the Marathon Parcel property line, which had been used as a driveway. Marathon then completed construction and re-opened its station.

In June 2000, S & S filed its complaint for trespass and injunctive relief. The trial court denied S & S's motion for a preliminary injunction, and the court subsequently granted summary judgment in favor of Marathon on the basis of mutual mistake. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing the grant or denial of summary judgment, we use the same standard used by the trial court. *Allstate Ins. Co. v. Smith*, 656 N.E.2d 1156, 1157 (Ind. Ct.App.1995). Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). In the context of cross-motions for summary judgment, the trial court must deal with each motion separately, construing the facts and inferences to be drawn therefrom in a light most favorable to the non-moving party. *Allstate*, 656 N.E.2d at 1157. If the facts are undisputed, our task is to determine the law applicable to those facts, and whether the trial court correctly applied it. *Id.*

### Summary Judgment

■ Marathon moved for summary judgment on the theory that the designated evidence showed that a mutual mistake occurred when Ramada, S & S's predecessor in interest, executed the Rider and that the Easement, not the Rider, provides the intended location of the twenty-five-foot easement. Because of the alleged mutual mistake, Marathon has invoked the doctrine of reformation, an extreme equitable remedy which allows the trial court to reform a written instrument only in cases of mutual mistake or fraud. *See Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 158 (Ind.1994).

However, the parties agree that a trial court should not reform a recorded instrument where a bona fide purchaser has acquired the property without notice of the alleged defect, or, in this case, the alleged mutual mistake. *See* Ind.Code § 32–21–4–1. As our supreme court explained in *Rinehardt v. Reifers*, 158 Ind. 675, 64 N.E. 459 (1902):

It is undoubtedly the law that an erroneous description of real estate in a mortgage that is full, and consistently complete within itself, and clearly and correctly identifies another body of land, will not be reformed to embrace an entirely different tract, to the prejudice of a subsequent mortgagee, who accepted his mortgage in ignorance of the mis-

---

1. The record shows that S & S leased a portion of its parcel for use as a parking lot for airport customers.

take, and in bona fide reliance upon the appearance of the public record.

Therefore, before we reach the substance of Marathon's reformation argument, we must first determine whether Marathon met its burden of establishing as a matter of law through the designated facts that S & S is not a bona fide purchaser. *See* T.R. 56(C).

### Bona Fide Purchaser

▇▇▇ To qualify as a bona fide purchaser, one has to purchase in good faith, for a valuable consideration, and without notice of the outstanding rights of others. *Keybank Nat. Ass'n v. NBD Bank*, 699 N.E.2d 322, 327 (Ind.Ct.App.1998). "The theory behind the bona fide purchaser defense is that every reasonable effort should be made to protect a purchaser of legal title for a valuable consideration without notice of a legal defect." *Id.* Here, Marathon asserts that S & S is not entitled to the protections of bona fide purchaser status because the designated facts show that it had implied actual notice, or should be imputed with such notice, that the Rider's description of the easement location was inaccurate. S & S contends that the material facts regarding whether it had notice of any alleged mistake in the Rider are in dispute and, thus, that summary judgment on the basis of reformation was improper.

As this court stated in *Keybank*, 699 N.E.2d at 327:

The law recognizes two kinds of notice, constructive and actual. Constructive notice is provided when a deed or mortgage is properly acknowledged and placed on the record as required by statute.... Notice is actual when notice had been directly and personally given to the person to be notified. Additionally, actual notice may be implied or inferred from the fact that the person charged had means of obtaining knowledge which he did not use. Whatever fairly puts a reasonable, prudent person on inquiry is sufficient notice to cause that person to be charged with actual notice, where the means of knowledge are at hand and he omits to make the inquiry from which he would have ascertained the existence of a deed or mortgage. Thus, the means of knowledge combined with the duty to utilize that means equates with knowledge itself. Whether knowledge of an adverse interest will be imputed in any given case is a question of fact to be determined objectively from the totality of the circumstances.

(Citations omitted).

In support of its contention that S & S had implied actual notice of the mistake in the Rider, Marathon directs us, in part, to portions of designated deposition testimony from Bikram J. Singh, one of two general partners of S & S. Specifically, Singh testified that he inspected the property before S & S purchased it from Ramada in 1986 and that he walked down the drainage easement located along the east property line of the Marathon Parcel. He further acknowledged that it was not possible to drive on the easement located to the east of the Marathon Parcel and that, to do so, that area needed to be developed.

Marathon also refers to the Verified Declaration of Isbell, who was vice president of Ramada, and who stated that "an easement along the East property line ... was not usable as a common driveway with the Ramada Inn because of the steep embankment and drainage culvert, while an easement on the West property line of the Marathon Parcel could be used for that purpose." Marathon further designated the Verified Declaration of David B. Holley, a professional Land Surveyor, who stated that "an easement for a common joint driveway located along the east side

of the Marathon Parcel would be useless to either the grantor or the grantee due to the steep embankment and drainage culvert." Finally, David Ayres stated in his Verified Declaration that "[o]n the east side of the station there was and is a steep drainage ditch, incapable of being used as a driveway." Attached to Ayres' Declaration are several photos of the area east of the Marathon station. Based on this evidence, Marathon asserts that when Singh inspected the property prior to S & S purchasing it, it was "obvious" that the area east of the Marathon Parcel could not be used as a common driveway and that the area west of the Marathon Parcel was being used for that purpose.

In response, S & S designated, in part, two affidavits, one from Signh and one from Sarmukh S. Saini, also a general partner of S & S. Saini's Affidavit provides in relevant part:

4. From the summer of 1986 through October, 1987, when the Ramada Inn Hotel, purchased by S & S, was destroyed by an Air Force Fighter Jet, concrete barricades existed along the common boundary between S & S and Marathon Oil [Company] on the west boundary line of [the Marathon Parcel].

5. There was no ingress/egress space between the barriers to enter the Marathon property from the real estate of S & S.

6. I expressly and specifically recall that on those occasions which I purchased gas from the Marathon Gas Station adjacent to the S & S property, it was necessary for me to exit the S & S property onto Bradbury Street, and then re-enter the Marathon gas Station from Bradbury Street via the curb cut on the Marathon property which provided ingress and egress to Bradbury Street.

Singh's Affidavit corroborates Saini's statements regarding the placement of the barricades "on the common boundary with Marathon Oil [Company] at Marathon's west boundary ..." Singh stated further that "[t]he apparent purpose of the barricades was to deny travel by Marathon patrons through the private property of Ramada."

Contrary to S & S's assertion, the material facts relevant to the issue of notice are not in dispute. In particular, it is undisputed that the area east of the Marathon Parcel property line is a steep embankment which leads into a drainage culvert. S & S admits that, at the time it physically inspected the property before it purchased the property from Ramada, it was aware of the drainage ditch along the east side of the Marathon Parcel. Singh testified that he walked along the drainage ditch at some point. While there is a dispute whether that area could ever be developed into a common driveway, it is undisputed that the area has never been used as a driveway by the parties or their predecessors.

Rather, the evidence shows that the area west of the Marathon Parcel property line has been used as a driveway for ingress and egress from the service station to Bradbury Street. Specifically, Ayres testified that both the service station and the hotel used the driveway for some time and that after Ramada erected barricades in 1984, the service station continued to use the driveway. That evidence is undisputed.

■ As this court stated in *Fenley Farms, Inc. v. Clark*, 404 N.E.2d 1164, 1171–72 (Ind.Ct.App.1980):

The law has always imputed to a purchaser of land all information which would have been conveyed by an actual

view of the premises, and when one purchases property where a visible state of things exists which could not legally exist without the property being subject to some burden, he is taken to have notice of the nature and extent of the burden.

Here, given that the express purpose of the non-exclusive easement was to provide a common joint driveway to serve both the hotel and service station, S & S should have noticed when it inspected the property and observed that, contrary to the Rider's description of the easement's location, the east side of the Marathon Parcel consisted of an undeveloped and steep drainage ditch and, consistent with the language of the original Easement, along the west side of the parcel there was a driveway with access to Bradbury Street. Based on the undisputed facts, we agree with Marathon that S & S's physical inspection was sufficient to place it "on inquiry" regarding the true location of the twenty-five-foot easement. *See Keybank*, 699 N.E.2d at 327.[2]

Still, S & S points out that given the location of the barricades at the time it purchased the property from Ramada, it was impossible for the area west of the Marathon Parcel to be used as a *common* driveway because a person pulling into that driveway from Bradbury Street had no direct access to the hotel. Rather, the driveway only served the service station. While the driveway may not have been used as a common driveway at the time S & S inspected the property, it is undisputed that it was the only driveway which was similar to that described in the Rider. Indeed, there was no driveway with access to

Bradbury Street along the east side of the Marathon Parcel. Again, the location of the driveway along the west side of the Marathon Parcel, together with the presence of the steep embankment and drainage ditch along the east side, was sufficient notice as a matter of law that S & S should inquire further about the location of the twenty-five-foot easement contained in the Rider. *See Mishawaka St. Joseph Loan and Trust Co. v. Neu*, 209 Ind. 433, 196 N.E. 85, 89–90 (1935) (stating notice of facts which would lead an ordinarily prudent man to make an examination which, if made, would disclose the existence of other facts, is sufficient notice of such other facts); *Cf. Ayres v. Lucas*, 116 Ind.App. 431, 63 N.E.2d 204 (1945) (affirming trial court's finding that residents were bona fide purchasers and stating that residents' knowledge that they had gas piped into their home, absent other visible signs, was not sufficient to charge them with knowledge that main pipe-line was located under surface of their land, nor was it sufficient to put reasonably prudent person upon inquiry). Therefore, we conclude that Marathon met its burden of proof in establishing that S & S is not a bona fide purchaser insofar as the easement is concerned.

### Reformation of the Rider

◼ Having determined that S & S is not a bona fide purchaser, we now address S & S's contention that the trial court erred when it granted Marathon's summary judgment motion on the basis of mutual mistake and reformed the language in the Rider. In cases involving an alleged mutual mistake, "the party seeking refor-

---

**2.** S & S relies heavily on the fact that whether implied actual notice exists is a question of fact, as if that alone is sufficient to preclude summary judgment. For summary judgment purposes, the relevant inquiry is whether there is a genuine issue as to any *material* fact. *See* T.R. 56(C). Here, the material facts relevant to whether S & S was placed on notice of the location of the easement are undisputed and, given the law on actual implied notice, summary judgment is appropriate on the bona fide purchaser question.

mation must establish the true intentions of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument therefore does not reflect the true intentions of the parties." *Estate of Reasor*, 635 N.E.2d at 158. As the court explained further:

> The primary purpose of reformation is to effectuate the common intentions of all parties to an instrument which were incorrectly reduced to writing. It follows that a grant of reformation is necessarily predicated upon a prior understanding between all parties on essential terms. Otherwise, there would be no standard to which an instrument could be reformed.

*Id.* (quoting *Pearson v. Winfield*, 160 Ind. App. 613, 313 N.E.2d 95, 99 (1974)). When granted in equity, reformation overcomes the presumption that the written instrument expresses the parties' intentions. *Id.* at 160. Stated differently, reformation overcomes the Statute of Frauds and has the potential to affect others beyond any immediate dispute. *Id.* Thus, to succeed in a reformation action a party must show both mutual mistake and the original intent or agreement of the parties by clear and convincing evidence. *Id.*

In support of its summary judgment motion, Marathon designated Isbell's Declaration, which explains in part that while he was vice president of Ramada, he executed the Option to Purchase agreement. Isbell also executed the Easement on behalf of Ramada after he had reviewed both the Marathon Plot Plan dated July 14, 1972, and the survey prepared by Weihe Engineers, Inc. dated August 29, 1972. Isbell stated further:

7. My current examination of [those] documents reveals that both the Marathon Plot Plan and the Weihe survey showed an existing driveway/curb cut on the Ramada Parcel immediately adjacent to the West property line of the Marathon Parcel. Based on my current review of the Weihe survey, there was a steep drainage culvert that abutted the east side of the Marathon Parcel. As shown on the Weihe survey ... there is a vertical drop of approximately 19 feet (elevation 749.2 minus 730.75) from the easternmost boundary of the Marathon Parcel to the center line of the drainage culvert, the center line being a distance of approximately 35–40 feet from the easement boundary of the Marathon Parcel.

8. Although the Easement referred to "the West property line," the Easement did not specify whether it was the West property line of the Marathon Parcel or the West property line of the [Ramada] parcel.... To better define the location of the common joint driveway in the Easement, [Ramada] prepared and I executed the "Rider to easement Dated November 13, 1972 between RAMADA INDIANA, INC. as Grantor and MARATHON OIL COMPANY, as Grantee." [Reference to attached exhibit omitted].

9. The Rider provided that the 25–foot easement would run from "from Bradbury Street along the East property line of the real estate described on Exhibit B in order that MARATHON and RAMADA shall have a common joint driveway use to serve both the service station and the Ramada Motor Hotel located in the Park Fletcher Industrial Park." The "real estate described on Exhibit B" was the Marathon Parcel.

10. [Ramada] would not have intentionally conveyed an easement to Mar-

athon [Oil Company] that was not useable. Based on my current examination of the documents, an easement along the East property line of the real estate described on Exhibit B (The Marathon Parcel) was not usable as a common driveway with the Ramada Inn because of the steep embankment and drainage culvert, while an easement on the West property line of the Marathon Parcel could be used for that purpose. I conclude that the intention of the original easement and the Rider was for the easement to be on the Ramada Parcel immediately adjacent to the West property line of the Marathon Parcel.

Marathon also designated the Declaration of David Holley, a Land Surveyor with Kimbley & Proctor, Inc. ("Kimbley & Proctor"). Holley stated in part that in December 1999, Marathon hired Kimbley & Proctor to prepare a Boundary and Topographic Survey of the Marathon Parcel. Holley stated the following regarding the Easement and Rider:

6. Upon my review of the easement and the Rider and a visual inspection of the Marathon Parcel, I became aware of an inconsistency in the location of the 25–foot easement and noted in the Surveyor's Report on the face of the Survey my conclusion as to the location of the 25–foot easement, as follows:

The 25 foot non-exclusive Easement for a common joint driveway as described in an Easement recorded January 23, 1973 as Instrument No. 73–4329 was originally located along the West line of the subject property. A rider attached to this easement amended the location of this Easement to the East side of the

subject property. This would have located the common joint driveway in the drainage ditch East of the subject property. The common drive as used, apparently for many years, is located along the West line of the subject property and was shown as such on this survey, subject to the above described uncertainty.

* * *

9. Normally, a survey is prepared with the directional arrow pointing to the top of the page, with north being at the top and south being at the bottom, east on the right and west on the left. However, Marathon's survey specifications at the time I prepared the Survey required that their surveyors prepare all surveys with the main road at the bottom of the survey, regardless of direction. Therefore, when I prepared the Survey I drew Bradbury Street at the bottom of the page and, in order to show the Marathon Parcel, I had to prepare the Survey with the directional arrow pointing down, showing north at the bottom and south at the top.

10. The easement references a Preliminary Plot Plan dated July 14, 1972 prepared by Marathon Oil Company, and survey dated August 29, 1972, prepared by [Weihe]. [References to attached Exhibits omitted.] The Preliminary Plot Plan is prepared with Bradbury Street at the bottom, with the north arrow pointing down, east on the left and west on the right. The [Weihe] survey, on the other hand, is prepared with Bradbury Street at the top, with the north arrow pointing up, east on the right and west on the left. This may have created confusion on the part of the original drafters of the Easement as to which side of the Mar-

athon Parcel was east and which was west, and the Rider was probably prepared and executed to correct a perceived error in the original Easement which did not exist.

11.  Based on my professional judgment and experience as a licensed surveyor, an easement for a common joint driveway located along the east side of the Marathon Parcel would be useless to either the grantor or the grantee due to the steep embankment and drainage culvert. However, an easement along the west side of the Marathon Parcel can be used for a common joint driveway for the benefit of the Marathon Parcel and the adjacent property west of the Marathon Parcel which was retained by the grantor of the Easement, which is consistent with current use and apparent use at the time I prepared the Survey. The only logical, possible and useable location for an easement for a common joint driveway was upon the real estate immediately adjacent to the west property line of the Marathon Parcel, as depicted on the survey.

Further, Marathon designated Ayres' Declaration, which establishes in part that the service station and the hotel had shared the driveway on the west side of the station, or the west side of the Marathon Parcel property line, until early 1984, when Ramada erected the concrete barricades. However, those barricades did not interrupt the service station's continued use of the driveway.

In *Estate of Reasor*, 635 N.E.2d at 160, n. 9, the court noted that in reformation cases where the written instruments are ambiguous, "the fact finder should consider, together with parol and other evidence of the original intent of the parties, what land the parties currently occupy or have occupied in the past." *See generally Fen-*

*ley Farms,* 404 N.E.2d at 1167–1171 (analyzing contested strip of land's use over period of years on review of trial court's determination that land was public roadway). Here, the undisputed evidence shows that before the Marathon station was damaged by fire in late 1999, the station had been using the area west of the Marathon Parcel property line as a driveway with direct access to and from Bradbury Street. And before Ramada erected barricades along that area, it also used the driveway for access to and from Bradbury Street. Such use is consistent with the purpose expressed in both the Easement and Rider.

In addition, Isbell's Declaration establishes that, at the time Ramada executed the Rider, Ramada's intent was to provide for a common joint driveway to serve both the service station and the hotel. Significantly, Isbell stated that Ramada "would not have intentionally conveyed an easement to Marathon that was not [useable]." Given that an easement along the east property line of the Marathon Parcel was not useable as a common driveway because of the steep embankment and drainage culvert and an easement along the west property line of the Marathon Parcel could be used for the purpose expressed in the Rider, Isbell concluded that Ramada's intention was to grant Marathon an easement along the *west* property line of the Marathon Parcel. Isbell's Declaration is the only designated evidence which addresses Ramada's intent. Indeed, S & S designated no contradictory evidence to create an issue of fact on intent.

██  Further, Marathon presented evidence to establish a mutual mistake. Holley's Declaration shows that because of the two depictions of the Marathon Parcel, namely, the Marathon Plot and the Weihe Survey, one of which was drawn with north at the top and the other of which

was drawn with north at the bottom, Ramada may have believed by mistake that it needed to execute the Rider to clarify the location of the easement. Again, based on Isbell's testimony, the Rider's description of the easement's location was not what Ramada would have intended. S & S did not designate any evidence to rebut Holley's statements regarding the alleged mistake in the easement's location.

Based on the undisputed designated evidence, we conclude that Marathon met its burden of proving by clear and convincing evidence that Ramada intended to grant Marathon an easement along the west side of the Marathon Parcel property line. We further conclude that a mistake was made when Ramada executed the Rider to the Easement, that the mistake was mutual on the part of both Ramada and Marathon Oil Company, and that the Rider does not reflect the true intentions of the parties. *See Estate of Reasor,* 635 N.E.2d at 158. We, therefore, hold that the trial court properly entered summary judgment for Marathon.

Affirmed.

ROBB, J., and MATHIAS, J., concur.